## NATIONAL LABOR RELATIONS BOARD *v.* FRUE-HAUF TRAILER CO.

Nos. 420 and 421. Argued February 11, 1937.—Decided April 12, 1937.

*Solicitor General Reed,* with whom *Attorney General Cummings* and *Messrs. Charles E. Wyzanski, Jr., Charles A. Horsky, A. H. Feller, Charles Fahy,* and *Robert B. Watts* were on the brief, for petitioner.

*Mr. Thomas G. Long,* with whom *Mr. Victor W. Klein* was on the brief, for respondent.

By leave of Court, *Messrs. Charlton Ogburn* and *Arthur E. Reyman,* as *amici curiae,* filed a brief on behalf of the American Federation of Labor, supporting the Act.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

In October, 1935, charges against the respondent, Fruehauf Trailer Company, were filed with the National Labor

Relations Board. The Board issued its complaints (in two cases) alleging that the Company was engaged in unfair labor practices as described in § 8, subdivisions (1) and (3) of the National Labor Relations Act. 49 Stat. 449; 29 U. S. C. 151 *et seq.* The practices were said to consist in the discharge of, and threats to discharge, employees because of their affiliation with, and activity in, the labor organization known as United Automobile Workers Federal Labor Union No. 19375.

Notice of hearing was given and the complaints were consolidated. Respondent appeared specially and filed motions to dismiss the complaints upon the ground that the Board was without jurisdiction and that the Act as applied to respondent violated Article I, § 1, and the First, Fifth, Seventh and Tenth Amendments of the Constitution of the United States. Answers were also filed, denying the charges and reserving the same jurisdictional and constitutional objections. Hearing was had. The Board received evidence upon the jurisdictional issue and, reaffirming an earlier ruling, denied the motions to dismiss. Hearing upon the merits proceeded, and in December, 1935, the Board made its findings and entered its order.

The order required the respondent to cease and desist from discharging, or threatening to discharge, any of its employees because of their joining the Union; from employing detectives for the purpose of espionage within the Union; and from interfering in any other manner with or coercing its employees in the exercise of their right to self-organization for the purpose of collective bargaining or other mutual aid or protection as guaranteed in § 7 of the Act. The order also required the respondent to cease and desist from discouraging membership in the Union or, in any other labor organization of its employees, by discrimination in regard to hire or tenure of employment. Respondent was directed to offer reinstatement to the employees who had been discharged, to make good their

losses in pay, and to post for thirty days notices that it had complied with the order in ceasing the interferences set forth.

The Circuit Court of Appeals dismissed the petition of the Board to enforce its order and set the order aside. 85 F. (2d) 391. This Court granted certiorari.

With respect to the nature of respondent's business the Board made the following findings: Respondent is a corporation organized under the laws of Michigan and is engaged in the manufacture, assembly, sale and distribution of commercial trailers and of trailer parts and accessories. The trailers are vehicles designed for the transportation of merchandise. Respondent's plant is located in Detroit and is the largest concern of its kind in the United States. Respondent maintains 31 branch sales offices in 12 different States and has distributors and dealers in the principal cities of the country. A wholly-owned subsidiary operates in Toronto, Canada, where sales are made and considerable assembly work is done with materials obtained from the Detroit plant and in Canada. More than 50 per cent. in value of the materials used by the respondent in manufacture, assembly and shipping during the year 1934 were transported to its Detroit plant from Ohio, Illinois, Indiana and other States. Most of the lumber was transported from southern States and most of the finished parts were transported from States other than Michigan. In 1934, respondent's sales amounted to $3,318,000. Its nearest competitor sold only 37 per cent. of that amount. More than 80 per cent. of its sales are of products shipped outside the State of Michigan through and to other States and to foreign countries. Between January 1 and November 1, 1935, 112 carloads of respondent's products were shipped to points outside the State of Michigan by railroad and 400 to 500 trailers with accessories were hauled over the highways by motor trucks or tractors to

points outside the State. About 30 chassis a day are finished at the Detroit plant of which 80 per cent. are started on their way to destinations outside Michigan. In connection with its interstate sales, respondent furnishes service in the determination of customers' needs and assists in the laying out of special construction requirements. Respondent's sales of trailers in Canada are accomplished through its Canadian subsidiary, and its sales in States other than Michigan are made through its branch sales offices and its distributors and dealers. It is a practice of respondent to consign trailers and parts to distributors and dealers in various States with title retained in respondent until payment is made. The manufacturing and assembly operations at the Detroit plant are essentially connected with and dependent upon the purchase, sales and distribution operations without the State of Michigan. The findings also describe various features of respondent's manufacturing and distributing activities.

With respect to the alleged unfair labor practices, the Board found in substance as follows: The United Automobile Workers Federal Labor Union No. 19375 had been organized among the production and maintenance employees of respondent's Detroit plant and, at the time of the occurrences described, included 177 active members and about 100 members who at one time or another paid dues and did not usually attend meetings. The production and maintenance men at respondent's factory at that time numbered about 400. Early in 1934, respondent hired a detective whose duty it was "to ferret out the union activities of the men" and to keep the respondent informed. This, as the respondent's vice president stated, was to avoid trouble and "to keep a steady flow of business." For purposes of deception, and in order to make the detective eligible for membership in the

Union, respondent gave him employment. He joined the Union and became its treasurer. He thus obtained a list of all the members of the Union. He made frequent reports to respondent and with the lists thus obtained respondent's superintendent went about the factory from time to time and warned various employees against union activities. The result of these measures "caused suspicion, unrest and confusion among the employees." A sub-foreman, who was later discharged, was urged by the superintendent to resign his office in the Union and work with the superintendent "to see that the Union did not gain strength in the plant." The sub-foreman, who interviewed applicants for work, was also instructed by his foreman to learn whether they belonged to a union or believed in unionism and was told that, if they did, they would be objectionable. Respondent "determined to put a stop to all attempts on the part of its factory workers to form an efficient independent bargaining agency and in furtherance of that purpose summarily discharged nine men and threatened three others with discharge." Two of the men were discharged before the Act became effective.

The Board found: "As to the remaining seven men who were discharged, the evidence is found principally in the testimony of the discharged men and other employees. There was no credible or substantial contradiction of this testimony. Our conclusions as to the unfair labor practices charged are reached after a consideration of such evidence and argument as were offered by the respondent, who failed to produce witnesses in its own employ obviously having knowledge of the facts surrounding these discharges, and who in its brief does not argue that its conduct did not constitute unfair labor practices."

The Board reviewed the particular cases of discharge and found that, in each, the employee was discharged be-

cause he joined and assisted the Union. The Board found that as a result of the discharges the members of the Union were coerced and restrained from any attempt to organize for collective bargaining; that respondent's acts "led to confusion, resentment, and bitterness among the employees, and tended to lead to a labor dispute burdening and obstructing commerce and the free flow of commerce" between Michigan and other States and foreign countries.

Respondent, on its part, traces the history of the development of its business from its small beginnings, emphasizing the outstanding success of its enterprise. Respondent criticises the finding as to the number of its employees who were members of the Union and states there was no proper basis for the finding that there were only 400 employees in the manufacturing and production departments. Respondent contends that the testimony negatived any showing of labor difficulties and that since its first operations there had not been a strike at the plant which hampered its operations. It is also urged that it was not shown that the discharges caused a strike at the plant or delay in operations. Respondent points to evidence that only 35 men voted for a strike out of a total of 700 production and manufacturing employees; that only 67 employees voted at the Union meeting and that the suggestion of a strike was voted down. Respondent contends that the testimony of its vice-president showed that, in discharging and laying off men during a slack period of production, the same standard was applied to Union and non-Union men, the determining factors "being the efficiency of the workman, his coöperation and whether or not he appeared to have the Company's best interests at heart in performing his duties."

Counsel for respondent in their brief state that "Respondent called no witnesses and offered no proof on the

question of alleged unfair labor practices, except that brought out on cross-examination of discharged employees and from witness Vosler [its vice president], called by the Board on this phase of the case. The Company at all times relied upon its position that the Board had neither jurisdiction over the subject-matter of these proceedings, nor over the person of Respondent, that the Act, as a whole, was invalid and the attempted application thereof by the Board to respondent in these proceedings was unconstitutional."

The Board in its findings stated that respondent's witness, Vosler, testified that "he knew none of the facts" surrounding any of the discharges "of his own knowledge" and the Board commented upon the failure of respondent to produce the foreman, or the superintendent, who were in a position to contradict the statements of employees, if they could be contradicted, with respect to the reasons for the discharge.

We have examined respondent's contentions and we are of the opinion that the findings of the Board, with respect to the nature of the respondent's business and the circumstances of the discharges complained of, are supported by the evidence.

The questions relating to the construction and validity of the Act have been fully discussed in our opinion in *National Labor Relations Board* v. *Jones & Laughlin Corp., ante,* p. 1. We hold that the principles there stated are applicable here. The decree of the Circuit Court of Appeals is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*Reversed.*

For dissenting opinion, see p. 76.