**MOORESVILLE COTTON MILLS v. NA-
TIONAL LABOR RELATIONS
BOARD.**

**No. 4207.**

Circuit Court of Appeals, Fourth Circuit.

Jan. 4, 1938.

Fred D. Hamrick, of Rutherfordton, N. C. (Zeb V. Turlington, of Mooresville, N. C., and Quinn, Hamrick & Hamrick and Fred D. Hamrick, Jr., all of Rutherfordton, N. C., on the brief), for petitioner.

Charles Fahy, Gen. Counsel, and Thomas I. Emerson, Atty., National Labor Relations Board, both of Washington, D. C. (Robert B. Watts, Associate Gen. Counsel, and Joseph Rosenfarb, Atty., National Labor Relations Board, both of Washington, D. C., on the brief), for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The Mooresville Cotton Mills, a North Carolina corporation, pursuant to section 10(f) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. 151 et seq., and section 160(f), petitions this court to review an order of the National Labor Relations Board whereby the corporation was directed to cease and desist from discouraging membership in Local No. 1221, United Textile Workers of America, by discrimination in regard to hire or tenure or any condition of employment, and from interfering with its employees in the exercise of the right of self-organization, to join labor organizations, and to bargain collectively; and whereby the corporation was further directed to offer reinstatement to eight former employees to their former positions and to make them whole for any losses of pay that they suffered by reason of the corporation's refusal to reinstate them on the date when each applied for reinstatement.

At the outset the petitioner asks the court to set aside the order in its entirety on the ground that it is engaged wholly in the local intrastate business of manufacturing, and therefore, as applied to it, the National Labor Relations Act is unconstitutional. The character of the business is indicated by the following excerpt from the findings of fact by the Board:

"Respondent is a corporation organized and existing under the laws of North Carolina, with its factory and principal place of business at Mooresville, North Carolina, and is engaged in the manufacture of towels, wash cloths, bath mats, furniture slip covers, automobile slip coverings, dress goods, men's suitings, curtain cloths, flannels, outing flannel, wide inner lining, and other novelty goods. Respondent is the second largest towel manufacturer in the United States, making approximately 15% of the towels manufactured. Its annual gross sales are approximately $3,000,000. In September, 1935, when the present controversy arose, respondent employed about 1400 persons. It employed over 2000 at the time of the hearing.

"Most of the materials used by respondent in the conduct of its business, such as cotton, chemicals, starches, dyes and fuels, are purchased by it from and through brokers and distributors located in North Carolina. Some of these materials, however, have their origin in states other than North Carolina.

"All of respondent's products except towels are manufactured to order. All of the orders for merchandise come to it through the New York offices of an independent commission company which has offices in numerous cities throughout the country and which distributes on a national scale. Upon receipt of an order respondent immediately proceeds to fill such order either by drawing on its stock in the case of an order for towels, or by manufacturing, in the case of an order for other items. Finished products are loaded by respondent's own employees in railroad cars on a siding inside the gates of respondent's plant whence they are shipped to all parts of the United States. Between 90 and 95% of its products are shipped to states other than North Carolina, either to ultimate consumers or to manufacturers for further processing. Respondent markets its products under various registered trade names and marks."

In addition the mill stresses the fact that all of the manufactured goods are sold f. o. b. Mooresville, N. C., through the New York office of a commission house.

The Board also found as to the effect upon interstate commerce of unfair labor practices or disturbances in the cotton textile industry, the following:

"The cotton textile industry is one which is singularly characterized by con-

stantly recurring labor strife. Vicious competition has brought low wages and long working hours to the workers employed in that industry. To improve their wages and working conditions employees have attempted to organize but their efforts have frequently proved unsuccessful. Interference with organization activities by employers, and the failure of employers to recognize the organization of employees, have been a constant source of unrest. Such unrest in the industry has in the past led to strikes and lockouts which have had a disastrous effect on commerce. Board Exhibit No. 16, under the title 'Strikes and lockouts in the Cotton Textile Industry in 1934, and in January to July, inclusive, 1935, by Major Issues Involved,' reveals that during the year 1934 and the first seven months of the year 1935, 94 strikes and lockouts took place in the cotton textile industry. These strikes and lockouts involved issues similar to those involved in the strike in the present case. These labor controversies involved 290,154 men, and resulted in a total of 3,958,891 man-days of idleness. The enormous economic loss incident to such controversies, caused in a great measure by conduct similar to that which gave rise to the strike in this case, and the resultant disastrous effects on commerce, and made apparent by the foregoing statistics.

"During the textile strike of 1934 respondent's plant was shut down for a period of three weeks. During this period it purchased no raw materials and shipments of merchandise from its plant were materially reduced. Such failure of production, of purchase of raw materials and shipments of merchandise is inherent in respondent's business in the event of any labor trouble in its plant."

▆▆ Upon these facts, it is our opinion that the Board was correct in its conclusion that the National Labor Relations Act is applicable to the operations of the mill because they have a close, intimate, and substantial relation to commerce among the several states. Stoppage of the operations through industrial strife would result in substantial interruption to the flow of interstate commerce in the manner and to the extent described in decisions of the Supreme Court as sufficient to justify a regulation by the federal government. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352;

National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 918, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352. We do not regard as important in this respect the fact that much the greater part of the raw materials and supplies used in the mill are purchased in the state of North Carolina. In National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 36, 57 S.Ct. 615, 623, 81 L.Ed. 893, 108 A.L.R. 1352, it was said that the Congressional authority to protect interstate commerce is not limited to transactions that form an essential part of the flow of commerce from state to state; and it has been subsequently held, where a substantial obstruction to interstate commerce would be involved in the stoppage of the operations of a manufacturing business, that the statute is applicable although the raw materials are found in the home state and do not move into it from other states. National Labor Relations Board v. Santa Cruz Fruit Packing Co., 9 Cir., 91 F.2d 790. It is also immaterial that there is a technical passing of the title to the goods when they are delivered by the manufacturer to the carrier at the factory, for this circumstance is merely incidental to the disposition of the goods in the state of manufacture, and has no relation to the interference with interstate commerce by labor disputes which the statute was designed to prevent.

The complaint against the employer, issued by the Board upon charges filed with it by the union, involved two specifications which in substance were as follows: (1) That on September 21, 1935, and at all times since that date, the corporation, by John F. Matheson its president, failed and refused to meet with, discuss, or bargain collectively with the duly authorized representatives of the union on grievances or any other matter; and (2) that at all times since July 5, 1935, the effective date of the act, the corporation, through W. F. Summers, superintendent of the plant, and Martin Wilhelm, overseer of the plant, "has constantly discouraged membership in said union by advising, urging and warning employees not to remain members of or assist said union by exhibiting open hostility to said union and its activities, by threatening employees with discharge or discrimination for remaining in said union or engaging in activities in connection there-

with, and by refusing to hire workers who are members of the union or who have engaged in activities in connection therewith."

The circumstances relating to the alleged failure of the president of the mill to bargain collectively with the representatives of the union, as set out in the findings of the Board and in the record, are substantially as follows: The union was established in 1919. It ceased to function in 1927, became active again in October, 1933, and in September, 1935, had approximately 424 members and shortly before the hearing in March, 1936, approximately 285 members. During the year 1935 T. F. Moore, the president of the union, was discharged, the reason being inefficiency, as the record abundantly shows, although as the Board said the committees of the union did not seem to be completely satisfied that this was the reason for the discharge. There were also other discharges, but there is no evidence in the record from which it may be inferred that they were unjustified or provoked by hostility to the union, and they were not made the basis of any complaint against the management. On September 17, 1935, J. R. Rogers, secretary of the union, was discharged. The Board made no claim against the mill in respect to this discharge and in fact it had no relation to his union activity. It led, however, to a meeting of the union on September 19, 1935, a vote to strike on September 23d unless certain listed grievances were redressed, the appointment of a committee to confer with the management of the mills, and the publication in a newspaper on the morning of September 20th of the statement that unless the mill acceded to certain demands, the strike would take place. No previous complaint had been made to the management and no attempt was made to confer with it until the morning of September 21st.

At this period, the mill was in a precarious financial condition. It was operating only part time and was unable to secure sufficient orders to keep it in full operation. A mortgage of $1,200,000 had come due on September 1, 1935, and a loan of $275,000 had been called by the bank. The management, in order to meet this emergency, had just succeeded, after long continued efforts, in obtaining a loan of $800,000 from the Reconstruction Finance Corporation with which to refinance the mill. Under these circumstances a conference took place on September 21, 1935, between the president of the mill and the committee of the union at which a written statement of grievances was presented. It charged in general terms that the methods used by the mills in hiring and discharging workers and the attitude of Summers, the superintendent in charge of this matter, involved discrimination against union workers. It requested the adoption of a fair rule for hire and discharge of workers, a discontinuance of discrimination against the union, and the reinstatement of the discharged employees to their former positions, and threatened to strike unless these requests were satisfactorily met. No particulars were given; and no claim was made by the Board in its subsequent complaint against the mill that it had been guilty of unfair labor practices with respect to any of these matters. Reciting the occurrences at the conference, the Board said:

"During the morning of September 21, 1935, a grievance committee of the Union met with J. F. Matheson, respondent's president, and presented to him a typewritten paper stating among other things that the overseers of respondent were engaging in practices which were tending to promote discontent among the employees and that the members of the Union were unable to give their best services under such conditions; it requested that respondent adopt a 'fair rule for the hiring and discharging of workers,' that respondent's overseers be instructed to discontinue their discrimination against union members, and that the discharged employees be reinstated to their respective former positions; it threatened a strike unless respondent satisfactorily met these requests. Matheson examined this paper and stated: '* * * It looks like it is a sort of a knife in the back to attempt to pull a strike without any knowledge whatever on our part of any grievance throughout the plant right at the time we are just on the verge of closing the loan and our financial troubles could be straightened out.' * * * 'It seems to me that this thing has been approached in the wrong manner here, but, there is one thing certain, we have spent nine months working purely for the interests of the employees of the Mooresville Cotton Mill, at heart, working to get the financial conditions of the mill straightened out so that employment can be maintained, and we hope increased, and there is one thing cer-

tain, that after all this work we have done, and since there has been no intimation of any grievance, the mill is going to open Monday morning and every employee in the Mooresville Cotton Mill that wants to come to work can come.' The committee concluded that Matheson's remarks were intended to foreclose any further discussion and withdrew. On Monday, September 23, 1935, the strike was called. On that day approximately 1000 of respondent's 1,400 employees went out on strike; this strike was still in progress at the time of the hearing.

"On the basis of the aforementioned conduct of Matheson on September 21, 1935, the complaint alleges that respondent has refused to discuss certain grievances with the committee of the Union and has thereby engaged in unfair labor practices within the meaning of section 8, subdivisions (1) and (5) of the act, 29 U.S.C. A. § 158(1, 5). We feel we would be warranted in concluding that respondent's conduct constituted an actual refusal to discuss grievances with the committee, but this it is unnecessary to decide. It is not an unfair labor practice within the meaning of section 8, subdivisions (1) and (5) of the act for an employer to refuse to discuss grievances with employee representatives when such representatives do not represent a majority of his employees. That the Union on September 21, 1935, represented only a minority of respondent's employees is clear from the record.

"In consequence, the allegations of the complaint under section 8, subdivisions (1) and (5) of the act, in so far as they are based on respondent's refusal to discuss grievances with the Union committee, will be dismissed."

We are in accord with this conclusion of law and with the Board's statement that it was unnecessary to decide whether the conduct of the president of the mill at the conference constituted an actual refusal to discuss the grievance; but we find nothing in the evidence to justify the suggestion that the management on this occasion failed to discuss grievances or bargain collectively with the representatives of the union.

It will have been observed that the second charge in the complaint filed by the Board to the effect that the officers and the employees of the mill had discriminated against members of the union was general in character and devoid of particulars. During the hearing in March and April, 1936, however, before a trial examiner appointed by the Board, the events following the conference of September 21st were fully examined. The testimony described the beginning of the strike on September 23, 1935, the establishment of picket lines, the commission of many acts of violence and abuse on the part of the strikers leading to arrests and convictions, the attempted use of dynamite near the house of the superintendent and near the mill. The business of the mill, however, went on first with about 400 men and then with increasing numbers until at the time of the hearing 2,000 workmen were employed, 600 more than when the strike began. From the beginning of the strike the doors of the mill were kept open for the return of the men, union and nonunion men being reinstated without question. There is substantial testimony on the part of the mill, from which the finding might have been made that in no instance was any discrimination made in the reinstatement of the men. There was, on the other hand, testimony that out of 1,600 men added to the force after September 23d, reinstatement was refused to 8 strikers on account of their connection with or interest in the union. These men had not been particularly conspicuous for union activity and 2 of them were not members of the union. But the testimony relating to service on committees or on the picket line, or membership in the union, coupled with refusal of reinstatement was sufficient, if believed, to support the finding and order of the Board in this respect, since section 10(f) of the act, 29 U.S.C.A. § 160(f), provides that the Board's findings as to the facts, if supported by evidence, shall be conclusive.

A modification of the order as to 4 of the men who were refused reinstatement must nevertheless be made on another ground. The conclusions of the Board in regard to the 8 men refused reinstatement include the following: "John Brown, R. M. Waugh, Van Benfield, A. J. Helms, Van Helms, C. E. Rogers, H. M. Hardy and Mrs. C. W. Sherrill, striking employees of the respondent, had not obtained regular and substantially equivalent employment elsewhere at the time of respondent's refusal to reinstate them"; and in its discussion on the law the Board said:

"That the work of respondent's striking employees had ceased in connection with or

in consequence of a current labor dispute is clear (see section 2, subdivison (9) of the Act [29 U.S.C.A. § 152(9)]. By virtue of section 2, subdivision (3) of the Act [29 U.S.C.A. § 152(3)], these striking employees in so far as they have not obtained regular and substantially equivalent employment elsewhere remained employees of respondent at all times after the strike. As such respondent was obligated under the provisions of the Act to refrain from committing any unfair labor practices against them."

We gather from these expressions that in the opinion of the Board a striking employee who obtains equivalent employment elsewhere ceases to be an employee entitled to reinstatement under the statute. That also is the opinion of this court, in view of section 2(3) which provides that the term "employee" shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute and who has not obtained any other regular and substantially equivalent employment.

The evidence as to 4 men, A. J. Helms, Van Helms, Van Benfield, and C. E. Rogers, is that they had obtained regular and substantially equivalent employment in places outside of Mooresville after they had been refused reinstatement by the mill and before the hearing by the Board. This testimony is not disputed and the contrary finding of the Board in this regard is without substantial evidence to support it. It is now contended by counsel for the Board that the phrase in section 10(c), 29 U.S.C. A. § 160(c), "including reinstatement of employees with or without back pay," refers to employees as of the time that the unfair labor practices occurred; or if interpreted to mean employees as of the time of the order of the Board or of the decision of the Circuit Court of Appeals, the authority conferred by section 10(c) upon the Board to require an offending employer to take such action as will effectuate the policies of the act must be held to include the power to compel an employer to reinstate persons unlawfully discharged, even though they have obtained other equivalent employment.

We do not so understand the terms of the act. When the definition of the term "employee" in section 2(3) to include any individual whose work has ceased as a consequence of a labor dispute "and who has not obtained any other regular and substantially equivalent employment," is read in connection with the corrective power given to the Board in section 10(c) to require employers, who have been guilty of unfair labor practices, "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this act," it seems plain that the reinstatement of employees who have gotten other equivalent positions was not contemplated. Congress desired in its definition of an employee to indicate that a worker does not cease to be an employee merely because he has lost or left his job in consequence of a current labor dispute; and we have held that the relationship between employer and employee is not necessarily terminated by a strike irrespective of the statutory provision. Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F. 2d 134. But it is not always easy to say whether a labor dispute, begun in the past, is still current. In the pending case, for instance, some of the workers did not deem that the strike was over months after it was called, although the factory was then far more busy than when the strike began. The definition of employee in the act, however, makes one thing clear—that is, that the dispute is closed, so far as reinstatement is concerned, as to any worker who has gotten equivalent employment.

The Board has indeed broad powers to require such affirmative action as will effectuate the policies of the act, but it cannot order any action clearly denied to it by the statute. We think, however, that the Board may require an employer to furnish back pay to men, who have been wrongfully refused reinstatement and have subsequently secured other positions, for the period between refusal of reinstatement and the obtainment of other employment. Such an order would not offend the terms of the act, would do justice to the worker, and would tend to effectuate the policies of the act.

In another respect, we think that the order of the Board should be modified. There is no need for the posting of notices in conspicuous places throughout the plant stating that the corporation will cease and desist from the unlawful labor practices described, or that such notices shall remain posted for a period of at least thirty days. The record in the case reveals no unfair labor practice or unjust treatment of the workers on the part of the employer prior

to the strike; and even after the strike, which caused great embarrassment and loss, the general practice of the employer in any view of the testimony was to take back the strikers irrespective of union affiliation. There is therefore no ground to apprehend a continuation of illegal practices, and no necessity to subject the employer to the stigma attached to the publication.

The order of the Board will therefore be modified by an elimination of the requirements as to the posting of notices in the plant, and as to the reinstatement of the 4 men, A. J. Helms, Van Helms, Van Benfield, and C. E. Rogers, with the modification, however, that the employer be ordered to make whole these men for any loss of pay they may have suffered by reason of the refusal to reinstate them by payment to each of them respectively of a sum of money equal to that which he would normally have earned as wages from the date of his application for reinstatement to the date of his acquisition of substantially equivalent employment, less any amount earned by each during the period.

For the reasons stated, the order of the Board will be modified as hereinbefore indicated, and a decree will be entered enforcing the order as so modified pursuant to section 10(f) of the National Labor Relations Act, 29 U.S.C.A. § 160(f).

Decreed accordingly.