## SOUTHERN COLORADO POWER CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 1958.

Circuit Court of Appeals, Tenth Circuit.

March 25, 1940.

PHILLIPS, Circuit Judge, dissenting.

James W. Preston and Harry S. Petersen, both of Pueblo, Colo. (Helmer Hansen, of Chicago, Ill., on the brief), for petitioner.

A. J. Rockwell, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Mortimer B. Wolf, Samuel Edes, and Leonard Appel, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

This cause is before the court on the petition of the Southern Colorado Power Company, herein called petitioner, to review and set aside a decision and order of the National Labor Relations Board, herein called the Board. The cause originates on the complaint of H. H. Stewart and I. L. Wat-

kins. The charge of the complaint is that petitioner engaged in unfair labor practices affecting interstate commerce within the meanings of Subdivisions (1) and (3) of Section 8, and Subdivisions (6) and (7) of Section 2, of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A.Supp., Ch. 7, §§ 152(6, 7), 158(1, 3). The Board made extensive findings of fact, and as a result thereof, concluded that:

## Conclusions of Law

1. By discriminating in regard to the tenure of employment of H. H. Stewart and I. L. Watkins and thereby discouraging membership in a labor organization, petitioner has engaged in and is engaged in unfair labor practices within the meaning of Section 8(3) of the Act.

2. That by interfering with, restraining and coercing its employees in the exercise of rights guaranteed by Section 7 of the Act [29 U.S.C.A. § 157], the petitioner has engaged in unfair labor practices within the meaning of Section 8(1) of the Act.

3. That the aforesaid unfair labor practices are unfair labor practices affecting commerce within the meaning of Section 2 (6) and (7) of the Act.

The Board thereupon entered its order, as follows:

## Order

That petitioner, its officers, agents, successors and assigns, shall:

1. Cease and desist from:

(a) Discouraging membership in any labor organization of its employees by discharging, or threatening to discharge any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment;

(b) In any manner interfering with, restraining or coercing its employees in the exercise of the rights of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining, as guaranteed in Section 7 of the Act.

2. Petitioner was directed to take the following affirmative action:

(a) Offer to H. H. Stewart and I. L. Watkins immediate and full reinstatement to their former positions, without prejudice to their seniority and other rights and privileges;

(b) Make whole H. H. Stewart and I. L. Watkins for any loss which they have suffered by reason of their discharges;

(c) Post immediately in conspicuous places throughout its various plants and places of business notices stating that the respondent will cease and desist in the manner set forth in Section 1(a) and (b), and that it will take affirmative action in Section 2(a) and (b) of this order, and maintain such notices for a period of at least sixty days from the date of posting;

(d) Notify the Regional Director for the Twenty-second Region in writing within ten days from the date of this order what steps petitioner has taken to comply herewith.

From this order an appeal has been taken to this court. The answer of the Board seeks enforcement of its order.

The following points are presented for consideration on appeal:

1. The Board was without jurisdiction over petitioner for the reason:

(a) That its operations are purely intrastate in character and do not substantially affect interstate commerce;

(b) If petitioner is subject to the jurisdiction of the Board as to part of its employees, the Board does not have jurisdiction over the office employees.

2. Petitioner has not been guilty of interference with, restraining or coercing its employees with respect to their right under the Act to organize.

3. Stewart and Watkins were not discharged on account of their union activities.

## Jurisdiction

Petitioner is a Colorado corporation, having its principal office and place of business at Pueblo, Colorado. It is a subsidiary of the Standard Gas and Electric Company of Delaware, a public utility holding corporation. It is engaged in the business of generating, buying, transmitting, selling and distributing electric energy. It operates a street railway system in Pueblo, Colorado, and also purchases, sells and distributes electric appliances and equipment at retail. It operates steam plants in Pueblo and Canon City, Colorado, and a hydro-electric plant at Skaguay, Colorado. All coal used in the steam plants is produced in Colorado and all water for the hydro-electric plant originates within Colorado. Its property is situated entirely in Colorado, extending over four counties. It supplies electric

energy to the Western Public Service Corporation, operating entirely in Colorado.

Petitioner serves a population of approximately 104,000 persons in an area covering about 7,000 square miles in the southeastern part of Colorado. No competing source of electrical power exists in the territory served by petitioner. During 1937, petitioner generated 84,508,360 kilowatt-hours and purchased 2,390,600 kilowatt-hours of electric energy. Of this amount, 758,630 kilowatt-hours were sold to interstate transportation and communication agencies; 4,141,692 kilowatt-hours were sold to manufacturing concerns selling part of their products outside of Colorado; 250,637 kilowatt-hours to newspapers of general circulation in Colorado and other states; 70,701 kilowatt-hours to radio broadcasting stations; and 56,997 kilowatt-hours to United States postoffices. Petitioner employed 399 persons and had an annual payroll of $732,669.90. In 1937 petitioner purchased material and supplies used for construction purposes in the operation of its business, amounting to $564,283.92, 35.6% of which was shipped to petitioner from points outside Colorado. In 1937 it also purchased electrical merchandise, equipment and supplies of a gross value of $122,484.91 for resale, approximately 10% of which came from points outside Colorado. Petitioner furnishes electricity to three railroads engaged in interstate commerce, and used by the roads for the lighting of railroad stations, for power purposes in repair shops, and in the operation of block signal devices, all in Colorado. It supplies energy to the Western Union and Postal Telegraph systems, both receiving and transmitting messages in and out of Colorado. The energy furnished is used by these companies in lighting their offices and stations and in transmitting messages, both local and interstate. Energy is also supplied to the Mountain States Telephone and Telegraph Company, which has telephone lines extending from the state of Colorado into other states. It also furnishes electric energy to a radio station at Pueblo, Colorado, to supply the power for the operation of the broadcasting station. This station broadcasts programs originated by the National Broadcasting Company. It supplies energy to Airway Radio Service at Pueblo, Colorado, to its airport, used by local airplanes and by planes engaged in carrying United States mail. The daily papers served by petitioner receive Associated Press or United Press Association service and carry a large amount of national advertising originating outside of Colorado. A large number of industries, such as manufacturing industries, situated in the area served by petitioner, are engaged in transporting commodities in interstate commerce and are dependent upon petitioner for electrical power and light, which are essential to the operation of their plants. Seven of the larger of these firms, which ship portions of their finished products in interstate commerce, alone purchased from petitioner in 1937, 4,141,692 kilowatt-hours of electric energy for lighting and power purposes. Some of the concerns furnished electric energy by petitioner had emergency equipment which could be used in the event that the supply of power from petitioner was interrupted. Others had no such emergency equipment.

■ The scope of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the jurisdiction of the Board in its administration are limited to interstate and foreign commerce, to the exclusion of operations which are essentially intrastate in character and which do not have an effect upon interstate commerce. Where federal control is sought to be exercised over activities which, separately considered, are intrastate in nature, it must appear that there is a close and substantial relation to interstate commerce in order to justify federal intervention for its protection. Unless these facts exist, the Board has no jurisdiction in a controversy between employer and employees. Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

■ The question whether operations do or do not affect interstate commerce in such a close and intimate fashion as to confer jurisdiction upon the Board must be determined by the facts as they exist in each case. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 393, 108 A.L.R. 1352; Consolidated Edison Co. v. National Labor Relations Board, supra.

■ It is urged that here the percentage of sales to interstate railroads and communication agencies amounts to less than 1% of the total out-put and that the percentage of all sales to concerns engaged in interstate commerce amounts to only 6%. The percent of out-put of any business which goes into interstate commerce is not

the true test. If the sale of only a fractional part of 1% of the total out-put of a business going to interstate commerce substantially affects such commerce, then jurisdiction attaches. The question in each case is not the percent of out-put of a business going into interstate commerce, but the effect thereof. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra.

█ Evidence was adduced that a labor dispute between petitioner and the office and accounting forces would not in any manner affect the production and distribution of electric power unless a strike of the office and accounting forces extended over a period of ten months, and that there would be no difficulty in replacing office and accounting employees who went out on strike. If the discontinuance of a certain department of a business would have no effect upon interstate commerce, then the Board has no jurisdiction over a labor dispute between such a department and the company. But here it clearly appears that a labor disturbance in this department would affect interstate commerce if it continued for ten months, or unless others could be found to replace those in the department. Under such conditions it cannot be said that the discontinuance of such a department or labor dispute therein does not affect interstate commerce.

An analysis of the testimony as set out above leaves no room for doubt that the nature, kind and quantity of the business of petitioner, the extent and volume of the equipment and supplies shipped to it by manufacturers from outside the state of Colorado, the relationship between the business of petitioner and interstate commerce agencies and the effect upon such agencies by an interruption of the relationship between them and petitioner's business, would substantially affect interstate commerce within the pronouncements of the Supreme Court. National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 918, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Fainblatt, supra.

The findings of the National Labor Relations Board as to its jurisdiction in the instant case are based upon substantial testimony and are approved.

## Unfair Labor Practice

In the spring of 1937, agitation began in petitioner's plant for increase in wages. The operating employees circulated a petition for an increase. H. H. Stewart was approached by one of the operating employees and asked to solicit the office employees' signatures to the petition. Stewart discussed the advisability of joining in the petition with other office employees, and together they decided to consult W. J. Benning, a director and officer of petitioner, before taking any action. Benning requested that they withhold action until he could consult W. N. Clark, president of petitioner. Thereafter Stewart was called by Benning and advised that Clark had expressed the desire that the office employees refrain from becoming involved in the petition, stating that if petitioner decided to grant a wage increase to the operating employees, the office employees would be similarly treated. Lester Morrell, an operating employee, who later became president of the International Brotherhood of Electrical Workers Local, urged the granting of the wage increase on Clark, stating that he feared the employees were becoming "C.I.O.-minded."

At the suggestion of other employees, Stewart conferred with Benning regarding the organization of the office employees. Benning requested that the matter be held in abeyance until he talked to Clark. Later Benning informed Stewart that Clark disapproved of the plan to include the office workers in the I.B.E.W., and preferred to deal with the office employees on an individual basis. He expressed his opposition to a union for office employees. Benning further advised Stewart that Clark desired the office employees to wait until the pending negotiations with the I.B.E.W. were terminated. Clark went to Europe without any decision as to wage increases for office employees.

Agitation was renewed for a separate union. Stewart discussed with office employees the advisability of organizing themselves into a separate union. A meeting was called for August 9 for the purpose of discussing the organization of a union of office employees. Clark had returned from Europe by this time. Robert Miller, secretary and assistant treasurer of petitioner, called Stewart to his desk and informed him that a conference of petitioner's officers had been held and that Benning was instructed by Clark that he did not want the office em-

ployees to organize a labor union. Stewart told Miller that the office employees were compelled to band together because Clark and Benning had failed to keep their promises with respect to salary increases. Miller then informed Stewart that petitioner had decided to grant pay increases to the office employees, thus making it unnecessary to form a labor union. In this conversation Miller also stated that petitioner could install accounting machines and lay off some of those in the general office. The same morning Miller informed T. F. Roach, an accountant in the general accounting department, of a raise for him, and declared that Clark was against the office organization, and that if they did go ahead and organize they could install accounting machines which would replace possibly a good many in the accounting department. In his testimony Miller stated that he did not recall making these statements, but admitted he might have said something in a similar vein to the employees. An attempt was made to have a committee of employees call on Clark, but they were informed that Clark would not see a committee. Clark asserted that he opposed the contemplated organization of office employees and declared that if the workers formed a labor organization no pay increases would be granted, and if such organization should call a strike, the entire office personnel would be replaced. According to Roach, he was instructed by Clark to deliver this message to the other employees. Clark admitted telling Roach of petitioner's opposition to the formation of the proposed union, but denied directing Roach to deliver any message to the meeting.

On August 16, the office employees received a general wage increase. As a result, Stewart and Watkins, after consulting with other employees, decided to cancel a further meeting looking to an organization of a union.

### The Discharge of Stewart and Watkins

November 30, 1937, H. H. Stewart and I. L. Watkins were discharged. Petitioner claims a reduction in force was made necessary by the contemplated installation of labor saving machinery. Benning stated that he reviewed the standing of all office employees with the department heads before reaching the decision to release Stewart and Watkins. The reason given for the discharge of Stewart was that he had been guilty of loafing, lack of civility to his superiors, lack of cooperation, and the belief that he would not fit into the new system. An incident occurring Armistice Day, 1936, was cited against Stewart. On that day, general accounting department employees were ordered by Benning to remain on duty beyond 11 o'clock. Miller observed Stewart advising a small group of his co-workers, war veterans, to remain at their posts in protest against this delay. When Miller informed them that Benning had granted permission for them to leave, Stewart stated that the significance of the day was lost and that Miller might tell "that pro-German (Benning) to go to hell, I'm staying." Roach and Sheets and other employees remained on duty with Stewart. Later Miller approached Stewart and apologized in behalf of Benning, saying he had forgotten it was Armistice Day. It was also charged that Stewart had assaulted an employee in 1921 or 1922. This Stewart denied. It was admitted that the alleged assault had been forgotten, that Stewart had never been disciplined for any of his alleged misconduct, no charge had ever been lodged against him. Although Miller testified that Stewart's short-comings continued to the date of his discharge, petitioner increased his salary as late as September, 1936, and again in August, 1937. Miller stated that Stewart was thoroughly competent. Of 15 employees in Stewart's department at the time of the discharge, only one had seniority over him. Stewart had been with petitioner uninterruptedly since 1916, save a period of 22 months when he served in the World War. Of four accountants in the department, Stewart had most seniority. He ranked as the third highest paid employee in the entire department and second highest paid accountant. When Stewart charged that he was being dismissed for his attempts to organize a union, Benning refused to discuss the matter.

The reason given for Watkins' discharge was that it was found necessary to transfer Sheets from the accounting department and it was determined to give Watkins' position to Sheets because Sheets was a better collector and had an invalid wife and needed work. The evidence reveals that Watkins also had a wife and also had a minor child to support. Watkins was generally recognized by the employees in the accounting department as the departmental leader. Watkins ranked sixth in seniority in the department. He was the fourth highest paid em-

ployee in his department. No objection was ever made to Watkins' work. Benning testified that Watkins was perfectly capable. During his employment Watkins received nine individual pay increases, one general increase, and one general decrease, which was later restored.

Stewart and Watkins were most active in the efforts to organize a union. Sheets seems to have taken an active part in opposition to the formation of a union, in the Labor Temple meeting on August 9. He warned the employees that they owed their jobs to their employer. On three occasions during the meeting Sheets called on Roach to address the meeting, saying that Roach knew Clark's attitude on the matter. Upon the repeated requests of Sheets, Roach took the floor and announced to the assembled employees that he had been informed by Clark that he was absolutely against the office organization. Sheets' part in the union meeting on August 9 was known to Benning.

The Board concluded that petitioner selected Stewart and Watkins for discharge in order to deprive the office employees of the leadership which they provided and to destroy the movement for union organization among the office employees. While the Board found that the labor saving machinery was not installed for the purpose of dismissing Stewart and Watkins, it did find that petitioner used the installation of labor saving devices to rid itself of the two employees whose activities directed toward the self-organization of the office employees.

The respective findings of the Board relating to the unfair labor practices of petitioner and to the discharge of Stewart and Watkins are challenged. The evidence relating to these issues is in sharp conflict, as are the inferences that can be drawn from the same. The Board resolved the conflict in each instance against petitioner.

██ The findings of the Board in each instance are supported by substantial testimony and are binding upon the reviewing court. National Labor Relations Board v. Waterman Steamship Co., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. ——, decided February 12, 1940.

A decree will be entered enforcing the order of the Board.

PHILLIPS, Circuit Judge (dissenting).

The street railway employees of petitioner had been unionized for over thirty years,

being employees of Street Railway Operators Local, No. 662.

In the spring of 1937, petitioner's operating employees formed Local No. 667 of the International Brotherhood of Electrical Workers, an affiliate of the American Federation of Labor. Petitioner, in no wise, endeavored to prevent the unionization of its operating employees. In fact, it favored their organization.

W. J. Benning was vice president and treasurer of petitioner and in charge of its office and accounting department.

In April, 1937, H. H. Stewart, an employee in the accounting department, heard that the operating employees were negotiating a contract with petitioner and took up with Benning the matter of an increase in pay for the office and accounting employees. Thereupon, Benning recommended to W. N. Clark, president of petitioner, that the office and accounting force be granted an increase in pay. Clark opposed an immediate increase because a ten per cent cut in the pay of the office and accounting employees had been restored in September, 1936. Benning advised Stewart that Clark desired the matter of an increase in pay for the office and accounting employees to wait until negotiations with the operating employees had been completed.

The contract with the operating employees was signed May 12, 1937. It contained a provision for the arbitration of differences between petitioner and the union, and further provided:

"It is expressly understood and agreed that the services to be performed by the employees covered by this agreement pertain to, and are essential to, the operation of a public utility and to the welfare of the public dependent thereon and in consideration thereof, and of the agreements and conditions herein by the Company to be kept and performed, the Brotherhood and the Union agree that, under no conditions, and in no event whatsoever, will the employees covered by this agreement, or any of them, be called upon or permitted to cease or abstain from the continuous performance of the duties pertaining to the positions held by them under the Company, and the Company agrees on its part to do nothing to prevent such continuity of performance of said employee, insofar as such performance is required in the normal and usual operation of the Company's property, and that any differences that may arise between the above

mentioned parties shall be settled in the manner herein provided."

Throughout the spring and summer, Benning repeatedly promised the office and accounting employees that he would endeavor to secure a pay increase for them. Action thereon was postponed, first, because the contract with the operating employees had not been consummated, and, later, due to Clark's absence. Clark was absent from Pueblo on a European trip from about May 20, 1937, to July 27, 1937. On his return he was confined to his home on account of illness for approximately one week.

In the latter part of July, 1937, action was taken under the leadership of Stewart and I. L. Watkins looking to the formation of a union by the office and accounting employees. A meeting was called for August 9, 1937, to consider the organization of such union.

Benning presented a pay increase program for the office and accounting force to Clark on the latter's return to the office shortly after August 1, 1937. Clark opposed the proposal because they had received an increase in September, 1936. Benning urged the increase on the ground that he had promised the office and accounting employees that a pay increase would be granted on Clark's return. Clark acceded and approved the proposal with certain modifications. While Benning may have believed the granting of the increase would forestall the organization of the union, I do not think that was his primary motive in urging the increase.

In the spring of 1937, petitioner began investigating the feasibility of installing certain accounting machines in its accounting department. This was due to an increase in the amount of statistical data required by various governmental agencies. The accounting practices of petitioner did not provide the required information and it was necessary to employ extra help to make such reports. This investigation continued until November 22, 1937, when petitioner's board of directors informally authorized the installation of the machines, and Clark approved such installation. Because of increased operating costs, prudent management required their installation.

From information gained from the manufacturer of the machines, it was determined that reduction in force of seven employees could be made and a saving of approximately $6,000 annually effected. Up to June, 1938, there had been a reduction of five employees and two more were dismissed shortly thereafter. Before the new system could be made fully effective, however, it was necessary to train personnel and gradually develop the full efficiency of the machines.

When petitioner determined to install the accounting machines, it took up with the representative of the International Business Machine Corporation, from which the machines were leased, the question of the qualifications of personnel to operate the machines. The representative advised that persons should be selected with electrical education or electrical experience who were mechanically inclined, who were accountants, and had executive ability, and that the persons selected to operate the machines should immediately take over the statistical work ultimately to be done with the machines. Petitioner found persons with the requisite qualifications among its employees. Two of those selected had previous experience as machine operators. One had had four years' training in the Denver University School of Commerce, including machine accounting. The employees selected took over work of a statistical nature that had theretofore been done by Stewart and W. A. Sheets.

To make provision for the machines it was necessary to construct a separate room and remodel the office quarters. It also was necessary to reorganize the accounting department, to select personnel best fitted to operate the machines and best suited to the new accounting system. After a conference between Benning and his subordinates, it was determined that in the reduction of the accounting personnel, Stewart and Watkins should be discharged. Benning and Robert Miller, his assistant, testified that Stewart was selected for discharge because he had been guilty of loafing, lack of civility to his superiors, insubordination, lack of cooperation, and because of the belief that he would not fit into the new system of accounting; that it was necessary to discharge Sheets or find other employment for him; that Sheets had an invalid wife; that Watkins was employed as a collector; that past experience showed Sheets was a better collector than Watkins, and for those reasons, it was determined to discharge Watkins and transfer Sheets to the position held by Watkins, and that neither Stewart nor Watkins was discharged because of union activity. Solely because they had been active in a movement to organize the office and accounting employees, because they had long been em-

ployed by petitioner, and because they were the first two selected for discharge, the Board found that petitioner had discriminated against them in regard to their hire and tenure of employment.

On several occasions during the spring and summer of 1937, in response to inquiries made by office and accounting employees, Clark and Benning stated that they favored the merit system rather than unionization of the office and accounting force.

On August 7, 1937, T. F. Roach, an employee in the general accounting department, had a conversation with Mr. Milliken, an executive of the petitioner. Roach told Milliken that there was unrest in the office, and he thought if Clark would see a committee it could be quieted and no further union activity would take place. As a result, Clark sent for Roach and told the latter that he would not see a committee, that he was opposed to the unionization of the office employees, that if they did unionize they would receive no increase in pay, and if they went out on strike, the entire office personnel would be replaced, and directed Roach to bring those facts to the attention of the employees who did not attend the meeting on August 9th.

### The Jurisdiction of the Board

In Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 468, 469, 58 S.Ct. 656, 661, 82 L.Ed. 954, the court·said:

"The critical words of the provision of the National Labor Relations Act in dealing with the described labor practices are 'affecting commerce,' as defined. Section 2 (7), 29 U.S.C.A. § 152(7). * * * The question that must be faced under the act upon particular facts is whether the unfair labor practices involved have such a close and substantial relation to the freedom of interstate commerce from injurious restraint that these practices may constitutionally be made the subject of federal cognizance through provisions looking to the peaceable adjustment of labor disputes. * * *

"Fourth. The direct relation of the labor practices and the resulting labor dispute in the instant case to interstate commerce and the injurious effect upon that commerce are fully established. The warehousemen in question were ·employed by petitioner in loading its goods either into the cars of carriers or into the trucks which transported the goods to the docks for shipment abroad or to other states. The immediacy of the effect of the forbidden discrimination against these warehousemen is strikingly shown by the findings of the Board. When the men found themselves locked out because of their joining the union, they at once formed a picket line, and this was maintained with such effectiveness that eventually 'the movement of trucks from warehouse to wharves ceased entirely.' The teamsters refused to haul, the warehousemen at the dock warehouses declined to handle, and the stevedores between dock and ship refused to load, petitioner's goods. These became, in the parlance of the men, 'hot' cargo. * * *

"It would be difficult to find a case in which unfair labor practices had a more direct effect upon interstate and foreign commerce."

It follows that the narrow issue presented is whether the unfair labor practices here involved, directed toward the office and accounting employees, bore such a close and substantial relation to interstate commerce as to make such practices subject to federal regulation.

The unfair labor practices were:

An increase in pay made in keeping with repeated promises of Benning throughout the spring and summer of 1937, to prevent the formation of a union by the office and accounting force;

The statements made by Clark and Benning in response to inquiries made to them by office and accounting employees, and the statement made by Clark to Roach;

In a proper and legitimate reduction of the office and accounting force, the selection of Stewart and Watkins for discharge because they had engaged in efforts to organize a union.

To affect interstate commerce, unfair labor practices with respect to the office and accounting employees would have to prevent or impede the generation and transmission of electrical energy by the operating department for instrumentalities engaged in interstate commerce and for manufacturers of goods for sale and shipment in interstate commerce.

The undisputed proof shows that the office and accounting force were receiving higher pay than like employees were receiving from other employers in Pueblo and

were also receiving free street car transportation and vacations and sick leaves with pay, and in the event of a strike by the office employees, that their places could be readily filled by other persons.

Mr. Bell, an organizer for the International Electrical Workers, attended the meeting held on August 9, 1937, and expressed opposition to taking the office and accounting employees into the operating employees' union. The operating employees, in their contract with petitioner, recognized the necessity for continuous operation of the electric generating and transmitting facilities and agreed not to strike and to submit any differences that might arise between them and petitioner to an arbitration board. There was undisputed evidence that a cessation of work by the office and accounting force for a period of as long as ten months would not seriously affect the generation and transmission of electric energy. Hence, it is my opinion that the facts as disclosed by this record do not warrant the finding that unfair labor practices with respect to the office and accounting force would in any substantial degree injuriously affect interstate commerce.

Because of the confidential relation between the office employees and the management, the latter was opposed to the unionization of the office and accounting employees. The wisdom of that view may be challenged, but whether wise or unwise, the office and accounting employees had the right, if they saw fit, to organize for their mutual aid and protection and to bargain collectively, and petitioner should not interfere with the free exercise of that right. But in the instant case, I think the protection of that right should be through the exercise of state rather than national power. The scope of federal power under the Commerce Clause must be "considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352.

I think the proceeding should be dismissed for want of jurisdiction in the Board.