## THE NEW BERNE.

### NORFOLK, B. & C. LINE, Inc., v. EVANS.
### No. 3914.

Circuit Court of Appeals, Fourth Circuit.
Nov. 12, 1935.

John W. Oast, Jr., of Norfolk, Va., for appellant.

D. Arthur Kelsey and Charles L. Kaufman, both of Norfolk, Va. (Kelsey & Jett,

of Norfolk, Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from a decree denying limitation of liability to the Norfolk, Baltimore & Carolina Line, Inc., owner of the motor vessel New Berne, which was destroyed by fire in the Chesapeake Bay in the early morning of September 20, 1933, and awarding damages to the administratrix of Leo H. Evans, the assistant engineer of the vessel, who perished in the fire. The New Berne was a small motor vessel, 104.8 feet in length and of 194 gross tons capacity, engaged in the transportation of freight between Baltimore and Norfolk. On the morning of September 20th, shortly after 1:20 o'clock, fire broke out in her engine room and spread rapidly, necessitating abandonment of the vessel by the crew. Decedent, who was in charge of the engine room, met his death in the fire.

The District Judge found that the vessel was unseaworthy in that she was negligently equipped with an auxiliary engine of antiquated type, for the starting of which open flame kerosene and gasoline torches had to be used, and in that oil and gasoline were stored in the engine room in such way that explosive gases and vapors were likely to escape therefrom and come in contact with the open flame of the torches when these were in use, as well as with other possible sources of ignition. He further found that the fire resulted from this unseaworthy condition, in that on the morning in question Evans had attempted to start up the auxiliary engine by the use of the torches and that this ignited gases and vapors which had accumulated in the engine room and thus caused the fire. There were findings also that this unseaworthy condition was allowed to exist with the privity and knowledge of the owner and that there was no assumption of the risk on the part of Evans. The appeal raises four questions, which we shall consider separately, viz.: (1) Was the vessel unseaworthy at the time of the fire? (2) If so, was the fire caused by this unseaworthy condition? (3) Did Evans assume the risk arising therefrom? And (4) was lack of privity or knowledge on the part of the owner established?

On the first question, we think there can be little doubt as to the unseaworthiness of the vessel. Her electric batteries had been allowed to run down; and when her main engine was not running she was dependent for electric current upon the operation of an auxiliary engine, which had to be started with an open flame kerosene torch used to heat a plug in the combustion chamber. This auxiliary engine was in an inclosed room, and the kerosene torch used to start it threw out a flame, sometimes six or eight inches, but sometimes several feet in length. This kerosene torch in turn was heated, so as to be usable, by a gasoline blow torch into which gasoline was drawn from a tank in the engine room; and both of these open flame torches were used in the inclosed engine room, surrounded by tanks of fuel oil, kerosene, and gasoline, from which dangerous gases and vapors were likely to escape from time to time.

This exposure of open flame in an atmosphere likely to be explosive or inflammable was entirely unnecessary and could have been avoided at slight expense; for it appears that about two years before the fire the auxiliary engine had been fitted with an electric plug for starting, which had been used for only a short time because of lack of an adequate battery to heat it, but that a proper battery could have been provided for this purpose and necessary changes in the engine made for its use at an expense of about $200. Instead of making this change, which the judge below found could have been made at such small expense, appellant required the workers in the engine room of the New Berne to follow the antiquated and dangerous method of starting the auxiliary engine which we have described. Of the nine vessels belonging to the appellant, the New Berne was the only one in which this antiquated type of equipment was used.

But negligence and unseaworthiness consisted not alone in the use of the blow torches in starting the auxiliary engine, but also in the storage of gasoline in the engine room in a tank not vented to the outside atmosphere. In the engine room were four 600-gallon tanks and one 80-gallon tank of fuel oil, one 80-gallon tank of kerosene and one 80-gallon tank of gasoline—certainly not very congenial company for the open blow torches. But there was one feature of this arrangement which was negligent and which rendered the ves-

sel unseaworthy irrespective of the use of the blow torches. The 80-gallon gasoline tank, so the judge below has found and appellant does not seriously contest the finding, had but two vents and these were both inside the engine room. One of these was a petcock at the top of the tank and the other a petcock at the bottom. It requires no argument to demonstrate that a gasoline tank vented to the interior of an inclosed engine room constituted a source of danger, even though the top petcock was supposed to be kept closed except when the tank was being filled, or the Palmer engine was running. When it was open, as it was from time to time, gases were likely to escape into the engine room which any chance spark might ignite. There would seem to be little doubt that the placing of this tank of gasoline in the engine room, with no outside vent, was of itself negligence; but there can be no question either as to the negligence involved or as to the unseaworthiness of the vessel resulting therefrom, where the use of open blow torches was required in the closed engine room in which such tank was placed.

■ On the second question, we think it equally clear that the unseaworthy condition of the vessel caused the fire. At 1:20 o'clock on the morning of the fire, Evans called the mate and told him that he intended to shut off the main engine for about half an hour. It was customary, when the main engine was shut off at night, to start up the auxiliary engine to furnish electric current for lights; and that Evans intended to start it up is shown by the circumstance that he did not suggest that kerosene running lights be hung out, for, when the main engine was not running, the only source of electric current for the running lights was the auxiliary engine. That he not only intended but attempted to start it up is shown by the fact that when the fire was discovered a few minutes later, an attempt was made to blow the whistle and it was found that there was no air pressure in the whistle box. This air pressure was used for only two purposes, to blow the whistle and to start the auxiliary engine. There had been full pressure in the box at midnight, the whistle had not been blown, and the absence of pressure shortly after 1:20 is accounted for only by the fact that Evans had been using the pressure in an attempt to start the auxiliary engine. Within about five minutes after notice was given by Evans that he was going to stop the engine, therefore, and before the engine was stopped, the engine room was found to be on fire and the air pressure gone out of the whistle box. This is certainly strong evidence that at the time the fire occurred, an attempt was being made to start the auxiliary engine. If such effort was being made, it involved the use of the open flame blow torches; and with the use of such torches in a closed engine room in the vicinity of a gasoline tank not vented to the outside atmosphere, it is idle to speculate as to other causes to which the fire might be attributed. Any reasonable man would say, as Evans' widow testified that appellant's superintendent and the captain of the vessel did say to her a few days after the tragedy, that the use of the blow torches was the cause of the fire.

The strength of the foregoing conclusion is but emphasized by the efforts of appellant to explain the fire on some other hypothesis. It is said that Evans might have started the fire by smoking; but it is hardly probable that he selected for smoking the time when he was starting up the auxiliary engine, and it would be foolish to attribute the origin of the fire to suppositional smoking, when the use of the open flame blow torches is shown almost to a moral certainty. One of the inspection plates was found to be missing from the engine when the vessel was raised some five months later, and it is argued that the plate may have been off the engine at the time of the fire and that the fire may have been caused by a spark from the electric motor of the bilge pump coming in contact with gas and oil thrown out by the engine through the hole from which the inspection plate was missing. But there is no evidence that the bilge pump was being operated or that there was any reason to operate it at the time of the origin of the fire, and it is pure supposition that the inspection plate was off the engine at that time, or that combustible gas or oil was being thrown out by the engine, even if it was off. It would be inexcusable to attribute the origin of the fire to such a cause, when a reasonable and probable explanation is at hand in the use of the open flame torches. Another theory is that gas vapors might have been developed by the use of gasoline for cleaning purposes. There is no evidence, however, that gasoline had been used for such purposes for a considerable period prior to the fire; and the probability that the gasoline might

be used in this way was but an added reason why open flame torches should not have been provided for use around the tanks of fuel oil and gasoline. The fact is that no theory advanced as to the origin of the fire explains its occurrence satisfactorily, except the use of the open flame torches in the closed engine room where gasoline was improperly stored.

The origin of gasoline fires must in most cases be established by circumstantial evidence; and the probative effect of such evidence ought not be disregarded because the ingenuity of counsel may suggest a number of ways in which such fires might have originated. In a number of reported cases, the courts have not hesitated to fix responsibility for gasoline fires and explosions under circumstances where the evidence as to the immediate cause has been far less satisfactory than in the case at bar. See Elkton Auto Sales Corporation v. State of Maryland (C.C.A.4th) 53 F.(2d) 8; Christopher v. Grueby (C.C.A. 1st) 40 F.(2d) 8; Sinclair Navigation Co. v. F. J. Bauer Towing Line, Inc. (D.C.) 27 F.(2d) 606; Erie R. Co. v. Murphy (C.C.A.2d) 9 F.(2d) 525; Standard Oil Co. v. R. L. Pitcher Co. (C.C.A.1st) 289 F. 678.

■■■ And we think that the judge below correctly held that decedent did not assume the risk arising from the unseaworthy condition of the vessel; for the rule is well settled that a seaman does not assume the risk arising from the unseaworthy condition of the vessel on which he serves even if such condition be known to him when he embarks. Scheffler v. Moran Towing & Transportation Co. (C.C.A.2d) 68 F.(2d) 11; Ives v. United States (C.C.A. 2d) 58 F.(2d) 201, 202; Howarth v. United States Shipping Board Corporation (C.C.A. 2d) 24 F.(2d) 374; Panama R. Co. v. Johnson (C.C.A.2) 289 F. 964, 978–980, affirmed 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748; Cricket S. S. Co. v. Parry (C.C.A.2d) 263 F. 523, 525. The rule was thus stated by Judge Ward in the case last cited: "The defendant contends that the plaintiff cannot recover because he shipped with knowledge of the condition complained of, and because, so far as the wire rope is concerned, proper rope could not be obtained. * * * We are considering the rights of seamen, who have constituted from early times a peculiar class. The unusual protection extended to them is reflected in the familiar saying that they are the wards of the admiralty. As to the second [first] proposition, shipowners cannot justify furnishing them with defective and dangerous appliances on the ground that they knew of it. * * * So, as to the second proposition, we think that vessel owners who sail their ships with improper appliances, when they cannot get proper ones, do so at their own risk, and not at that of the seamen."

■ It is argued that where suit is brought under the Merchant Marine Act 1920, § 33, 46 U.S.C.A. § 688, to recover damages on account of the injury or death of a seaman, the defense of assumption of risk should be applied just as though the injury had occurred on land. This is not correct. It is true that the Merchant Marine Act provides that in actions on account of the injury or death of a seaman the "statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply." But those statutes do not make assumption of risk a defense. It was a defense at common law. They merely regulate the liability arising out of negligence, provide that contributory negligence shall diminish damages instead of barring recovery, and abolish the common law assumption of risk as applied to actions arising out of violations of the Safety Appliance Acts (45 U.S.C.A. § 1 et seq.). 45 U.S.C.A. §§ 51, 53, 54. Assumption of risk is a defense, therefore, in an action for injury on land brought under the federal employers liability act, and not involving the safety appliance acts, because the defense existed at common law and is not affected by the statute. In an action under the Merchant Marine Act, assumption of risk is not a defense as applied to the unseaworthiness of the vessel, because it was not a defense prior to the enactment of the statute, and the statute has not created the defense. As said by Judge Rogers in Panama R. Co. v. Johnson, supra, 289 F. 964, at page 980: "The maritime law imposed upon the shipowner the risk incident to the use of defective and dangerous appliances, and we see nothing in the new legislation which changes the law in this regard. The Federal Employers' Liability Act [45 U.S.C.A. §§ 51–59] did not create the law. It simply recognizes it as it already existed and restricted it in the classes of cases embraced in section 4 of the act [45 U.S.C.A. § 54]."

■ It is argued that as defendant was on a regular run in the Chesapeake Bay be-

tween Norfolk and Baltimore, making three trips a week and spending a large part of the time on shore, he does not come within the spirit of the rule which exempts seamen from assuming the risk of defective appliances and unseaworthy condition of vessels on which they serve. The contention is that his position was similar to that of a harbor worker or longshoreman, and that he should be held to the same rule regarding assumption of risk as if he were working on shore, reliance being placed upon the decision in Scheffler v. Moran Towing & Transportation Co., supra, 68 F.(2d) 11. We are not impressed with this contention. Decedent was unquestionably a seaman, not a harbor worker or longshoreman, and his rights were governed by maritime law. Under that law, risk arising from unseaworthy condition of the vessel or defective appliances was not assumed; and we have no disposition, even if we had the power, to import into the maritime law the common-law doctrine with respect to assuming the risk of the master's negligence. That doctrine had its origin under conditions very different from those which prevail to-day, and should be limited rather than extended. To say that the servant assumes the risk of the master's negligent failure to provide him safe and suitable appliances with which to work, because he does not exercise the theoretical freedom of choice to leave the employment, is little short of mockery of the economic necessity which requires him to work with any appliances which may be provided. Instead of adopting the common law rule in admiralty, the rule of admiralty should be adopted by the common law, so that one whose negligent failure to provide safe appliances has resulted in injury to an employee should not be allowed to escape liability on the plea that the employee voluntarily assumed the risk of such negligence.

The contention that the owner was without privity or knowledge of the unseaworthy condition of the vessel can be briefly disposed of. The president and general manager of appellant knew that the electric batteries of the New Berne were worn out and unserviceable and that the auxiliary engine was being started by the use of the kerosene torch. He knew of the gasoline tank being placed in the engine room, and he would have known that it was not properly vented to the outside atmosphere if he had had the vessel properly inspected. He himself gave her

such inspection as she received from time to time, inspecting her about once a year according to his testimony and depending upon the engineer to keep him advised as to conditions and appliances in the engine room. The vessel was tied up three times a week within one hundred feet of his office; and it is hard to believe that he should not have known all about her condition. The conclusion is inescapable that he either knew of the use of appliances which rendered the vessel unseaworthy, or that his lack of such knowledge was due to negligent failure to have the vessel properly inspected. It is well settled that privity or knowledge of such an officer is privity or knowledge of the corporation and precludes limitation of liability under the statute. Craig v. Continental Ins. Co., 141 U.S. 638, 646, 12 S.Ct. 97, 35 L.Ed. 886; The Republic (C.C.A.2d) 61 F. 109; The Annie Faxon (C.C.A.9th) 75 F. 312; Pocomoke Guano Co. v. Eastern Transp. Co. (C.C.A.4th) 285 F. 7.

The decree appealed from will be affirmed.

Affirmed.