## WILSON & CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.

### No. 415.

Circuit Court of Appeals, Eighth Circuit. April 12, 1939.

Rehearing Denied April 25, 1939.

244

James D. Cooney, of Chicago, Ill. (John F. D. Meighen, of Albert Lea, Minn., and Marshal Wiedel, of Chicago, Ill., on the brief), for petitioner.

Malcolm F. Halliday, of Washington, D. C. (Charles Fahy, Gen. Counsel, National Labor Relations Board, Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, Laurence A. Knapp, Robert S. Erdahl, and Richard C. Barrett, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before STONE, WOODROUGH, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

On a charge filed with it by the Independent Union of All Workers, the National Labor Relations Board filed a complaint against Wilson and Company which was succeeded by a second amended complaint upon which there was a hearing by an examiner and later by the Board. The second amended complaint involved two matters: One was the discharge and refusal to reinstate Elmer Wenzel, a former employee of the company. The other was for domination and interference with the formation and administration of and contribution to the support of a labor organization of the employees known as the "Wilson Employees' Representation Plan." Both the examiner and the Board found the above accusations to be true and the Board entered an order thereon. The company filed its petition for review of this order and the Board filed a response praying enforcement of the order. The matter is presented here upon a typewritten record of 1,161 pages and over 140 original exhibits.[1]

Four distinct matters are presented. The first is a challenge of the jurisdiction of the Board. The second is the claim of unfairness by the examiner and by the Board. The third is concerned with the alleged discharge and failure to rehire Elmer Wenzel. The fourth is the actions of the company in relation to the above Employees' Representation Plan.

Before discussing each of these separately, it is useful to have a short statement of the general situation. Wilson and Company is a very large meat packing industry with plants located in various places in this country. One of these plants is at Albert Lea, Minnesota. At this plant the company purchases various kinds of live stock which are there butchered and manufactured into a great variety of meat products. This plant is in fairly continuous operation and employs several hundred men, most of whom work in the various departments of killing and production. We are concerned only with this plant except that, in connection with the Employees' Representation Plan issue, there is involved a relatively small poultry packing plant located about fifty miles away at Faribault, Minnesota.

### Jurisdiction of Board.

The jurisdiction of the Board is attacked upon two grounds: First, that no valid complaint was filed with the Board, and second, that the company is not engaged in interstate commerce. The issue as to valid complaint is a contention that the complaint was not filed by a labor organization. This complaint was filed by the "Independent Union of All Workers", acting through its president. The evidence abundantly establishes that this organization is properly classed as a labor organization and, therefore, this contention must be resolved against the company.

The second contention as to jurisdiction is the claim that the plant at Albert Lea is engaged solely in the manufacture of meat products and not in inter-

---

[1] Upon service of the original complaint, the company instituted an action in the United States District Court for the District of Minnesota seeking a declaratory judgment that the Act was invalid and praying an order enjoining further proceedings by the Board. That petition was dismissed and upon appeal to this Court there was an affirmance. Wilson & Co., Inc., v. Gates et al., 8 Cir., 90 F.2d 247.

state commerce. The undisputed evidence shows that the live stock slaughtered at this plant is bought mainly in Minnesota but partly in other States. The evidence shows, also, that the finished products of this plant are disposed of both in Minnesota and outside and are shipped from the plant both to points within and to points without that State—about eighty-one per cent going outside the State. In essentials, the situation here does not differ from those held to constitute interstate commerce in National Labor Relations Board v. Jones & Laughlin, Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352; and National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352. This issue must be resolved against the company. The jurisdiction of the Board is sustained.

Partiality of Examiner and of Board.

■ This issue is a contention that the examiner and also the Board were unfair in the hearing and determination of the matters before them. Several instances of rejection and admission of testimony and of failure to enforce a subpoena duces tecum are urged as proof of unfairness. We have read the entire record. We are impressed that the examiner was entirely fair. We have no doubt of his intention to be fair and we think that his conduct of the hearing was commendable. Whether he may have erred as to some matters of evidence is not controlling since we find no evidence excluded which would be vital on either of the main issues (see National Labor Relations Board v. William Randolph Hearst et al., 9 Cir., 102 F.2d 658, decided March 23, 1939).

A matter particularly stressed has to do with an application by the company "for issuance of subpoena and subpoena duces tecum". This application was dated July 16, 1937, and filed upon that date in the office of the Regional Director. At the close of all of the evidence, a copy of this application was made part of the record before the examiner. At that time, a discussion between counsel for the company and for the Board revealed that subpoenas had been brought by counsel for the Board to give to counsel for the company but that they had not been handed to such counsel although available during the hearing. The reason offered by counsel for the Board for not delivering the subpoenas was that there had been some conversation between counsel and "I [counsel for Board] thought that when we left Mr. Cooney [counsel for company] that he was going to reconsider whether he wanted these subpoenas." The situation seems to have been the result of a misunderstanding. When this became clear at the time counsel for the company sought to place the copy in the record before the examiner, no request for the delivery was then made. Nor was any remedy sought in this Court. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 226, 59 S.Ct. 206, 83 L.Ed. ——.

The Board accorded a full hearing upon exceptions to the report of the examiner. We find no ground for the complaint that the company was not accorded a fair hearing either by the examiner or by the Board.

Elmer Wenzel.

One of the two issues presented by the complaint was the action of the company in discharging and refusing to rehire Elmer Wenzel. The charge is that he was discharged and not rehired because of his activities as a member of the Independent Union of All Workers. There was no question as to the discharge and as to a refusal to rehire shortly after the discharge. There is a situation concerning the attitude of the company and of Wenzel in connection with a proposition to rehire him some months later.

The position of the company as to the discharge was that he was discharged for bad workmanship resulting in losses to the company. The individual directly responsible for and who actually discharged Wenzel was Grover Jackson, immediate foreman over Wenzel. The issue here is whether there is substantial evidence that Wenzel was discharged because of his union activities. The direction of the evidence is such that this issue really takes the practical aspect of whether there is substantial evidence that he was not discharged for poor workmanship.

To understand the evidence on this issue it is necessary to state a background which is undisputed. This plant was in charge of a manager. Under him were superintendents of various general departments. Under the superintendents

were foremen of particular departments. While the manager had authority to discharge and reinstate, this power was rarely exercised. Because it was deemed necessary to the discipline in the particular departments, the power and duty of discharging employees and of reinstating them in the same department was left to the particular foreman. There seems no dispute as to this policy.

The general department of manufacturing, which was the main business of the plant, was divided into particular departments, usually connected with either the packing or the preserving of particular animals. One of these departments was that of hog killing and cutting. The work in this department involved the killing of the hog and the cutting up of the carcass into certain parts, such as hams, shoulders, bellies and loins. The general procedure in this department was as follows. A live hog would be hung up by a chain attached to a hind leg. In this position he would be killed, then dehaired, then gutted, then beheaded. The carcass would then pass into a refrigerating room for removal of the animal heat. From refrigeration the carcass would be brought out, the hams and shoulders removed and the remainder cut in two lengthwise along the backbone. Each of these two sides remaining included the parts known as loins, back fat, ribs and belly. An employee called a scriber, would cut through the ribs on a line designated, which was usually from four to five inches away from and roughly parallel to the backbone. This cutting was by an electrically operated saw. The next operation is that with which we are particularly concerned. It was the removal of the loin, which is called "loin pulling". That was the work being done by Elmer Wenzel at the time of his discharge.

Loin pulling required particular skill and loin pullers were among the best paid men in the pork killing and cutting department. The necessity for skill arose from the situation that the loin was the most valuable cut in the side of the hog, rating about ten cents a pound higher than any of the other cuts. The loin was joined on one side to the back fat which was a strip of fat meat extending outward of and along the backbone. The loin was separated from the back fat only by a thin tissue. The value of the loin lay in the lean part but to protect this lean part from undue drying; to meet the demands

of the retail trade; and (for purposes of profit) to add thereto a reasonable amount of the less valuable fat, it was highly desirable so to pull the loin that a layer of fat from one-fourth to one-half inch would be left without exposing the lean meat in the loin. If the fat were cut too thick it would be trimmed off later and the trimmed portion would be only lard stock, which was less valuable than the fat back from which it had been taken. If the fat were cut so thin as to expose the lean meat in places, there would be a corresponding loss in value through appearance and diminished weight of the loin. Such exposure of the lean meat was called "scoring". It was because of the necessity of pulling the loin with this layer of fat and of the fact that the operation had to be quickly performed and that the fat side was underneath and out of sight of the operator, that considerable skill was required in pulling loins. This experience could be gained only by practice and was acquired rather by the educated "feel" of the operator who was using a U-shaped knife with a handle at either end. Because of the character of this experience, even a skilled loin puller would somewhat lose the knack if he were not rather constantly engaged in the operation. Even at the best there would rarely be one hundred percent perfect operation without scoring. This situation resulted in a system of grading for scoring which was that scores of less than a dollar sized exposure of lean meat were not counted as scores and that an allowance of between five and ten percent of scored loins was permissible in good operation. Above that percentage was regarded as bad operation.

When the sides come down to the loin pullers they are drawn along opposite sides of a table some four to six feet wide. Two pullers work at the same time, one upon the right side and the other upon the left. The loin pulling is in the line of a continuous operation and the operation is rather rapid, the hogs moving at the rate of from 150 to 400 per hour.

Another important consideration is in the condition of the hog. If it comes from the refrigerator too hard or too soft the loin pulling is more difficult. Also, if the hog is lean and the meat tough (called "skippy") the operation is difficult. The instructed procedure when the meat is too hard or too soft is to slow up the operation to give more time to the loin puller.

When a "skippy" side is encountered, the instruction is to put it aside on a truck where the loin is separated by a different shaped knife and in a more careful operation.

Elmer Wenzel had been a charter member of the Independent Union of All Workers when it entered the Albert Lea field in 1933. He had been a director or other official from the beginning. Sometime in February, of 1935, when the president of the local became disqualified, he, as a vice-president, became the temporary president, until in July, 1935, at the election of the local, he was elected president. He had been with the company for about eighteen years and was an expert loin puller.

In the normal conduct of the business of the company, a considerable amount of its fresh pork products is shipped daily to the Wilson and Company plant at Chicago, from which point it is distributed. At Chicago the meat so sent is subject to and often is inspected since it goes from there to the trade. As Chicago is the company headquarters, there are frequent communications from the Chicago offices to the managers of the various plants as to the character of the product sent in there.

On February 18, 1935, the head of the fresh pork department in Chicago wrote to the head of the provision or shipping department in Albert Lea concerning the condition of loins that day received from the Albert Lea plant. This letter was, on the whole, quite critical of the condition of the loins. This criticism had to do with various features such as the "scribing" and the "scoring". There was, also, criticism as to some of the shoulders in the shipment. Some of these faulty loins and shoulders were returned to the Albert Lea plant for comments. Copy of this letter was sent to the manager and to the superintendent of the hog manufacturing department of the Albert Lea plant. These complaints were passed on to foreman Jackson who took them up with the two loin pullers, one of whom was Wenzel, pulling the right side, and a man named Torgerson, pulling the left side.

March 6th, another letter of criticism came from Chicago. Besides a detailed criticism of the loins in several boxes, the letter states:

"Further our A-103 wire of today with reference to the loins which we inspected, we asked the plant to hold out one box of each average so that we might inspect them and we were quite disappointed to note that even after the two previous letters which we have written you with reference to the trim on your pork, your loins continue to show very poor workmanship.

"The loins which we examined and which we will describe in this letter, do not represent the worst boxes out of a number of boxes examined. They are merely three boxes of loins which we asked the plant to hold for our inspection and were the only boxes which were opened. * * * It is merely a question of getting your plant set to properly follow cutting instructions. Want you to get right on this and 'camp' on it until all these points have been corrected.

"You have made improvement on a good many of the points which we found to be wrong on the first two shipments. As we have stated previously, the bevelling and the fat limits, as well as the covering of the blade bones were right, and there should be no difficulty in getting these other errors corrected at once.

"Would like to have you write us what you find upon your investigation into this, also what progress you are making to get these things lined up correctly."

On June 4th, an even more positive complaint came from Chicago to the manager at Albert Lea. This letter was as follows:

"We are writing you this note under personal cover, because from the various reports that we have had up with you from time to time, it seems that your Cutting Room work must be way below par.

"We attach herewith report on Pork Loins 16/22 received in Chicago, May 29th. The comments herewith speak for themselves, indicating that a large percentage of these Pork Loins would have made suitable Canadian Backs.

"You will also notice that the Loin pulling was bad and scribing out of line. If this kind of work is being done regularly in your Cutting Room, your light Loins must also be way out of line.

"Too many Pork Loins are scored. We had occasion to look at your shipment to the Chicago plant covering 8/10 and 12/15 Pork Loins and out of 31 pieces inspected, eleven pieces were badly scored.

"Just got a report from the plant that shipment of Fresh Spareribs received

here, out of two barrels received Friday, inspection was made and eleven pieces were badly ribbed, carrying part of the skin and excessive lean. Most of these Ribs no doubt were made from skippy Hogs, but even at that, there is no reason why they should carry an excessive quantity of lean meat, which would be suitable for Special Trimmings and worth more money than if left on the Sparerib.

"We are not commenting on a certain number of Spareribs that were not up to standard, but these particular eleven pieces were very badly ribbed.

"We know that you will take this letter in the right spirit. We are not writing you to find fault with Albert Lea's work because you know that we are not in the habit of doing things like that, but we do like to see the work closer to standard. It hurts your results to have careless Cutting Room work. Just think of the many things that probably go on because we haven't a chance to comment on them when we don't get a chance to see them.

"With your light kill and cut, there is no excuse at all for your Cutting Room standard not being close to 100%.

"In the past, we have brought quite a few irregularities to Albert Lea's attention and the replies showed that it was hard for you to understand that things were as we reported them, however, when this product was returned to you, our reports were verified.

"Awaiting your reply."

The detailed report attached to this letter shows 30 percent of the loins badly scored with the comment "(hardly believable such poor work in loin pulling)". Shortly thereafter a man (William J. Stube) was sent by the Chicago office to Albert Lea to seek to remedy this situation. This man remained at Albert Lea from June 10th to June 13th, inclusive. Upon his return to Chicago, he made a report to the general superintendent concerning the Albert Lea plant which was as follows:

"I will put in this report just what I found when I arrived at Albert Lea to check the Hog Cutting work. From the Loins, I saw at Chicago that were being shipped from Albert Lea during the last several shipments before I went to Albert Lea, it was very plain that they were doing very poor work on loin pulling. I made reports immediately to your office and the Chicago Provision man checked the cuts too that came in from Albert Lea.

"The first day that I arrived at Albert Lea, which was Monday morning, I went direct to the loin cooler. Messrs. Eastwood, Williams, Stadheim, Chap and Flatt accompanied me to the cooler. Dr. Swaim went along and kept track of the figures and wrote them down as we counted them. The reason I went to the loin cooler first was because of the poor work I found on their Pork Loins when they came to Chicago. In the presence of all the men we opened the boxes, which was about 10 to 15 boxes of different averages—8/10, 10/12 and 12/15. Each box had some loins scored. One box would have two loins scored, others would have five or six scored. That means the scored loins ran from 12 to 60% per box. After we counted up all the loins that were scored in all the boxes that were opened, they averaged 32% and they were all badly scored. We did not count the smaller scores. Now this is very poor loin pulling. If it is 3 to 5% scored it is pretty bad but to have it 32% scored it is very poor loin pulling. All this we checked and saw before we even went to the cutting floor. After we got through checking in the loin cooler, we started to go to the cutting floor, but they had cut all the hogs and we could not see any loin pulling work on the cutting floor Monday.

"On Tuesday, we went to the cutting floor to check the loin pulling. Mr. Chap set his own men, including Mr. Flatt at the loin chute where they come down from the cutting floor to count the number of loins scored, and out of entire Tuesday's cut, according to Mr. Flatt's count, there were 48% loins scored, of which one half of that number were badly scored.

"Wednesday morning there was no cutting. Then I talked to the Loin Pullers and tried to show them how to pull loins right. I looked at their knives and the knives seemed to be all right. I tried to show them how wrong it was to score loins and I tried to show them how much money we waste when we score loins, besides hurting the appearance of the product.

"I will write the balance of my report this afternoon but I wanted to get this off to you right away because this is important. By Thursday, the loin pulling

was coming along fine and you sent me up there to get it right and I did so, but it must be followed up to be kept right."

On June 13th, the general superintendent of the Albert Lea plant wrote the Chicago office concerning the above visit, as follows:

"We were very glad to have Mr. Stube with us here. We have gone into everything in the pork end very thoroughly with him. He found some things which we were not doing properly and which should have been caught by us here.

"Will assure you that we are going to follow up our pork cutting and see that we maintain the standard set up by Wilson & Company. There is no reason for us not doing it and that is the way we put it up to the foreman of this department, as well as the others concerned."

On June 14th, the general superintendent in Chicago wrote a letter jointly to the manager and superintendent at Albert Lea concerning the condition wherein he said as to the matter of loins: "It probably hurts me as much as it hurts you folks when we see a thing like this loin situation get out of hand. I want to again repeat, as I have said so many times, that you must not let labor cost control, in any way, interfere with efficient cutting, and Mr. Stube didn't find that to be the case. I was wondering if it wouldn't be a good idea for J. C. Williams [general superintendent at Albert Lea] to probably come in and spend a few days around the Chicago cutting. What are your thoughts on this?"

After each of these letters the manager and superintendent at Albert Lea took up the situation, with increasing insistence, with the foreman Jackson. He was told that it was his job to see that the loins were properly pulled and, in substance, that if he could not secure this result there would have to be a change of foreman. While it was the normal business of Jackson to oversee the loin pulling operation as well as the other operations in the hog cutting department and to see that they were properly done, this situation caused him rather to concentrate on the matter of proper loin pulling. He was increasingly anxious about retaining his job if he could not remedy the situation. He took the matter up repeatedly with Wenzel and Torgerson, the loin pullers. Their work would improve temporarily and then slump

back. Several of his higher officers made several checks of this loin pulling by inspecting the loins after they had passed from the pullers to the floor below. They found numerous instances of scoring. In June or July, Jackson made up his mind that the above two loin pullers, while capable of doing better work, would not do so. His repeated admonitions had resulted only in temporary improvements. To save his own job he determined to discharge the two loin pullers at that time. The plant manager and plant superintendent prevailed upon him not to do so but to make further efforts to rectify the situation. This he did, but the condition, he thought, was not remedied and, on August 17, 1935, he discharged both men. He did this without the knowledge of any of his superiors. The next day a committee of the Employees' Representation Plan urged the reinstatement of the two men upon the manager and the superintendent. These officials were agreeable to such reinstatement if Jackson would consent, since he was the one immediately involved, and responsible for the work and the discipline of the men under him. A meeting was held that afternoon at which the manager, the superintendent, Jackson, Wenzel and, possibly, members of the above committee were present. At that meeting the matter of re-employment of Wenzel and of Torgerson was put up to Jackson, who refused to consent.

Some months after this occurrence and after the charges had been filed by the Labor Board, Wenzel, at the suggestion of the Regional Labor Board Director, conferred with the general manager concerning his re-employment. There were several conferences within a short while between Wenzel and the manager and on two occasions one of the vice-presidents of the company was present. The substance of the results of these conferences was that the company was willing to re-employ Wenzel, to put him on another job which paid the same as loin pulling, and to give him a written statement that if he performed his work satisfactorily his seniority and other rights would be restored. Wenzel refused this upon the grounds that he then had employment (though at a much lower wage); that he doubted the faith of the company and feared he would be soon let out without any job; and that he felt the members of his union would think that he had "let

them down" if he should accept the employment.

The testimony of Wenzel to combat the bad workmanship charged was along several lines. He denied undue scoring. He admitted scoring but stated that it was caused by the sides being too hard or by the number of "skippy" sides. He charged that the scoring was done by Torgerson, who was not as good a workman, who did not like his job and who was deliberately scoring loins to secure transfer to some other job.

The evidence is well nigh conclusive that from February until the above discharge, on August 17th, there was much scoring of loins at this plant. The question was whether this scoring was being done by Torgerson while Wenzel was doing good work during this time or, if Wenzel was scoring, whether it was because of condition of the sides. When the loins pass from the loin puller they go to a loin trimmer, who cuts off surplus fat and, apparently, shapes the loin in minor particulars. From the trimmer they pass down a chute to the floor below where they land upon a table and are there packed for shipment. Jackson and two other officers of the plant made inspections of loins which had passed down to this packing table. Each of them testified that it was easy to distinguish the right and left side loins and that they noticed little difference in the scoring of the loins coming from the two loin pullers. On the day of the discharge Jackson directed Wenzel to go to the packing table and see the condition of the loins which were coming down. Wenzel testified that there were thirteen loins there which were scored and that five or six of them were his work. Also, he testified that he might, at various times, have scored as high as 16 percent of the loins. He blamed this unduly high percentage upon the condition of the sides coming to him, saying that some were too hard and that others were "skippy". He admitted that the "skippy" sides should be laid aside for a different character of cutting and he admitted that he could take the time necessary properly to pull those sides which were hard.

The evidence was that there were, at the time of discharge, no other competent loin pullers in the plant and that two other men, with only slight experience, had to be broken in; that this period of breaking in required a month or six weeks; and that, during the period until the men gained experience, there was loss through inefficient loin pulling.

Considering all of the above facts it is inconceivable that discharge of these two men could have been other than in good faith because of the character of workmanship. There is no substantial evidence that Wenzel was not doing defective work without any proper excuse therefor and it is conceded that he was a highly competent man and could have done good work.

This trouble began in February, 1935. It reached its first crisis in June, when Jackson had determined to discharge the two loin pullers. If the company officials had desired to be rid of Wenzel because of his union activities it is strange that Jackson's superiors would have then prevailed upon him to retain Wenzel and Torgerson and give them another chance. It is stranger still when we reflect that this was shortly before the enactment of the National Labor Relations Act and the management could then have gotten rid of him without subjecting themselves to the provisions and operation and penalties of that approaching legislation which was of wide public notoriety. Also, it is undisputed that the day after this discharge, Jackson's superiors at the plant were entirely willing that the men be taken back and tried further. It is very clear that the discharge of these men came from Jackson and Jackson alone. There is not one word of evidence of any animosity by Jackson toward Wenzel, personally, or toward the union, of which he was an officer, or that Jackson had any interest at all except in seeing that the work was done to the satisfaction of his superiors so that he (Jackson) could save his own job. It is significant, also, that both of these experienced loin pullers were discharged in the face of the fact that Jackson and everyone else connected with the matter understood that the company would suffer loss for several weeks during the training of men to take their places. We cannot find any evidence whatsoever, much less any substantial evidence, that the discharge of Wenzel was not solely for the reason that Jackson thought he was not doing the work as it should be done and that he would not do it as it should be done—in short, for good cause. Our conclusion is that the determination of the Board as to the discharge of Wenzel is not sustained.

The Employees' Representation Plan.

This issue involves the interference by the company with the formation and the administration of this bargaining agency for the employees and also financial and other contributions thereto by the company. We have read the evidence upon this matter and it seems to boil down to the following: The Independent Union of All Workers was a labor organization, apparently, very ready to resort to violence to attain its ends. In the town of Albert Lea it had attempted to organize various industries. There was pronounced violence (in connection with other industries) by this union resulting in destruction of property, attacks upon peace officers and rather serious rioting, requiring a large deputizing of peace officers to restore order. A vigorous campaign had been made by the union to unionize the employees of Wilson and Company plant.

Since 1921 there had been a form of bargaining established in the plant through a joint committee composed of representatives of the workers and of the management. This plan seems not to have been entirely satisfactory to the employees. However, whether some were satisfied therewith or whether many were very much dissatisfied with the general conduct of the above union in the town and were moved by fear that the packing company would close down and they would lose their jobs, there seems to be little doubt that there was a pronounced diversity among the employees as to joining or not joining the Union. There was well nigh constant discussion and dispute between the men upon this matter, sometimes resulting in fights. Also, there was one or, possibly, two minor disturbances in the plant, though none of a large or continued nature.

█ Into this troubled situation came the Employees' Representation Plan, which seems to have become effective in April, 1935. While the testimony for the company is that numbers of the men came to the manager with a request to work out some plan which would restore harmony and that it was in pursuance of that request that the management and the men together worked out this plan, yet there is substantial testimony that the plan was drawn up and presented by the company. The Board is thus supported in its finding that the formation of this bargaining agency was promoted by the company. Also, it appears that there were no dues, that such expenses as were necessary for ballots at employee elections and for other necessary matters in connection with the organization were borne by the company. Also, that the company financed picnics, which this organization initiated and for which it claimed credit. Under all the circumstances here, we think these contributions may properly be treated as within the inhibition of the statute and as having the effect of promoting this organization against any other which the employees might want to form or join.

We think the Board is sustained by substantial evidence in its findings of unfair practices under the Act in these particulars and in its decision that this is not a proper bargaining agency within the Act.

### Conclusion.

The order of the Board will be modified by striking therefrom the affirmative action requiring reinstatement and reimbursement of Elmer Wenzel—being subsections "(a)" and "(b)" of Section "2" of the order. "Disestablish" (as used in subsection "(c)" of Section "2" of the order) and "disestablishes" (as used in subsection "(d)" of Section "2" of the order) are construed as meaning complete withdrawal of any recognition of the Wilson Employees' Representation Plan organization and complete cessation of all financial or other support thereof.

As thus modified and construed the order of the Board is ordered enforced.