## NATIONAL LABOR RELATIONS BOARD v. BOSS MFG. CO.
### No. 6433.

Circuit Court of Appeals, Seventh Circuit.
Nov. 7, 1939.

Rehearing Denied Dec. 7, 1939.

H. G. Ingraham, Charles Fahy, Gen.
Counsel, Robert B. Watts, Associate Gen.

Counsel, and Mortimer B. Wolf and Marcel Mallet-Prevost, all of Washington, D. C., for National Labor Relations Board.

David R. Clarke, of Chicago, Ill. (John Harrington and Albert J. Smith, both of Chicago, Ill., of counsel), for respondent.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This case is here upon petition by the National Labor Relations Board for the enforcement of an order issued by the Board against the Boss Manufacturing Company, pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

The proceeding was instituted by Local 85 of the International Glove Workers' Union of America, a labor organization. The unfair labor practices charged, filed on November 11, 1935, were that the respondent had interfered with, restrained and coerced its employees in the exercise of the rights guaranteed under Section 7 of the Act in violation of Section 8(1), and had refused to bargain collectively with representatives selected by a majority of its employees in violation of Section 8(5). An amendment to the charge, filed April 16, 1936, alleged a violation of Section 8(3) of the Act in that respondent had discharged eight employees for Union activities. Respondent filed an answer denying the charges and challenged the constitutionality of the Act. A hearing was had before a Trial Examiner on April 30 and May 1, 1936, at which respondent renewed its motion to dismiss and withdrew from the hearing.

On June 22, 1936 the Trial Examiner filed his Intermediate Report, finding respondent guilty of unfair labor practices to which exceptions were filed, and on August 27, 1937 the Board issued its original order.

On October 28, 1937 the Board filed its petition for enforcement, and on December 2, 1937 respondent filed its petition for leave to adduce additional testimony. On January 12, 1938 we granted the petition, subject to a motion to strike the testimony after it had been adduced.

A further hearing was held, and on August 23, 1938 the Trial Examiner filed with the Board his Intermediate Report on the additional testimony adduced, in which he found that the Union had continued to represent the majority of the employees and that all except four of the employees had been offered reinstatement. He recommended that the Board's order of August 27, 1937 be reaffirmed, with the exception of the direction to reinstate those employees on strike on August 8, 1935.

On February 20, 1939 the Board rendered its supplemental findings, concluded that respondent had engaged in unfair labor practices within the meaning of Section 8(1), (3) and (5) of the Act, and reaffirmed its order of August 27, 1937.

On March 31, 1939 the Board filed its motion to strike the additional testimony adduced.

The first, second and third order of the Board directs respondent to cease and desist from interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, refusing to bargain collectively, and discouraging membership in the Union, while (4) (f) directs respondent, upon request, to bargain collectively with the Union as the exclusive representative of its productive employees.

The respondent is engaged in the manufacturing of workmen's gloves and allied products, maintaining sales offices or branch factories in New York, Ohio, Indiana, Missouri, California and Illinois. In 1935 it employed about 382 production workers in its main plant at Kewanee, Illinois, shipping the major portion of its products out of the State of Illinois.

In February of 1935 the men and women employed in the leather-cutting department formed an unaffiliated labor organization. On March 4, 1935 a committee from this organization met with Charles M. White, superintendent of the plant, and requested a modification of the Bedeaux system of wage payments.[1] They were told an effort would be made to remedy conditions.

On May 8, 1935 the employees became affiliated with the American Federation of

[1] The Bedeaux system is a rather complicated wage payment plan, which reduces all factory work to a common denominator by setting a standard amount of required production per minute for every sort of job. The standard is spoken of as 60 points or "B's" per hour. For reaching it, workers are given moderate bonus, and for exceeding it they receive 75 percent of the saving, the remaining 25 percent going to the foreman, indirect labor, and management.

Labor as Local 85 of the International Glove Workers' Union of America, the membership being open to all production employees.

On May 31, 1935 John Jones, one of respondent's foremen, informed Camile Tremont, an employee, that White had told him (Jones) that this thing was getting serious, and approached Tremont and three other employees with a proposal that one or more of them attend a meeting of the Union and "go to bat" for respondent at the Union meeting. On June 25, 1935 Jones again approached Tremont and requested him to disclose the names of the girls in the sewing department who were members of the Union. And on July 9, 1935 Jones said to Tremont: "Well, the boys took a strike vote last night * * * it looks pretty bad. * * * They are going to make a mistake. * * * That is an awful thing. * * * I had a brother that was in a strike down there at Wallworth's, and he never could get a job again, and he had to move all the way to California. There are some more around town that could not get any jobs in these factories."

On June 15, 1935 Jones also had a conversation with Grace Bremmer, another employee, at which time he told her that the Union would take her money without giving her anything in return, and that his brother, who had been discharged by his employer for joining a Union, had been compelled to leave town in search of other employment.

In an advertisement in the Kewanee Daily Star Courier, published in September 1935, respondent stated that there was no advantage gained by membership in the Union and accused the Union of coercing its employees into joining.

On July 9, 1935 a Union committee met with Charles M. White and informed him that the Union had been designated as the representative of a majority of the employees and requested that respondent deal with the committee; this the respondent refused to do, contending that the designation by a majority of the employees did not enable the Union to represent any employee who had not so designated it. As a result, a strike was called on August 8, 1935.

On September 8, 1935 the Union committee met T. R. Stokes, respondent's president, and Harry Scheck, a Federal conciliator. Stokes, on behalf of respondent, again refused to bargain with the Union as the representative of all the employees. On September 28, 1935 Stokes, in a circular sent to all of the employees, stated that the sole issue of the strike was the determination of the Union to force the respondent to recognize, deal with and contract with the Union as the agent of all the employees at the Kewanee plant.

■ It is undisputed that the respondent refused to recognize the Union as the exclusive bargaining representative of its employees in an appropriate unit. It took the position that the majority rule principle would be invalid if construed to authorize the representation of a minority by a majority Union. In refusing so to recognize the Union, respondent was in the wrong. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 42, 44, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

■ Based upon the foregoing facts, we think the Board was warranted in the conclusion that there was substantial and adequate evidence to justify the findings that respondent had interfered with, restrained and coerced its employees in the exercise of their rights to self-organization; that respondent's conduct tended to discourage membership in the Union; and that the Board was justified in directing respondent to bargain collectively with the Union as the exclusive representative of its production employees.

The fourth order (a) (d) and (e) commanded respondent to offer reinstatement with back pay to four employees found to have been unlawfully discriminated against in discharge and refusal to reinstate.

The evidence discloses that Marion McCullough was one of the organizers of the Union, became its vice president, was active in its affairs, and that respondent knew of his activities. He had been in respondent's employ as a leather cutter for about ten years, except for an absence of one month in 1929 and of one year during 1932-1933. About March 4, 1935 he participated in a conference with Charles M. White about rates of pay and conditions of employment.

On June 28, 1935 there was a general seasonal lay-off of all the employees and the plant was closed for an indefinite period, but not on account of any unfair practices. It should be remembered that the National Labor Relations Act became effective July 5, 1935. On July 5, 1935 McCullough came to the plant for his pay for

the period preceding June 28.. In his pay envelope he found a slip, instructing him to report to William Paul, an assistant foreman, who informed him that when the plant reopened the number of employees would be reduced, due to business conditions and lack of orders, and that his services were no longer required.

On July 6, 1935 he spoke to White who informed him he found no fault with his work, but since the force was being reduced he had better look for another position. McCullough inquired if his membership in the Union had anything to do with his discharge, and White replied, "I don't want to hear anything about that organization. Don't mention Union to me because I am not interested in it."

From June 28 until October 16, 1935 the plant remained closed. When it reopened, no new outside help was hired in the leather cutting department. But McCullough, who had not worked at the plant since June 28, 1935, testified that a less skilful grade of cutters were promoted to be glove cutters and new men hired as tip cutters. Three leather cutters, who had been rehired after the lay-off, active members of the Union, all seniors in point of service to McCullough, however, did not testify to that effect. White and one Blair, respondent's vice president, testified that no tip cutters had been promoted to be glove cutters.

Jerry Barry was a leather cutter employed from January 1927 to October 1931 and from August 1932 to June 28, 1935. In February 1935 he became an active member of the independent organization and of the Union in May 1935, participating in the conferences with respondent's officers.

On June 28, 1935 White informed him that for the past thirty days his production had been below par and he was told to look for work elsewhere. In answer to the question "When were you discharged?" he answered, "I presume * * * I was discharged that day but I did not get official notice until about a week later."

No other persons were employed to do the work formerly performed by McCullough and Barry and it is undisputed that subsequently 23 other employees doing the same class of work as McCullough and Barry were permanently laid off.

Grace Bremmer, a leather sorter, had worked for respondent for about two and one-half years. Prior to the general lay-off, she and three other girls had been employed at this work, Grace Bremmer being longest in point of service. All four were dismissed, but Anna Scholes was re-hired in November 1935. On June 6, 1936 Grace Bremmer married a union employee of respondent. There is no evidence that she ever worked or attempted to work after her marriage. The evidence also discloses that about May 30, 1937 another young lady was transferred to the leather-cutting department.

Jess Harlan had been employed as a husker-cutter and sweeper from April 1929 until May 1935. About six weeks before the seasonal lay-off he was transferred, at the same rate of pay, from the sewing room to the leather room, and another man was employed in the sewing room. On June 28, 1935 he too was told there was to be an indefinite closing of the plant and when it reopened it would be with a reduced force.

He became a member of the Union in March or April 1935, but the record does not disclose that respondent knew at the time Harlan was discharged that he was a member of the Union. The trial examiner in his Intermediate Report found that Harlan had not been discharged because he was a member of the Union.

The point is made that these four persons were not employees of the respondent at the time the Act became effective. In the view we take of the instant case we need not discuss that question, but rather determine whether the Board was justified in concluding that respondent discriminated against these four employees by discharging them because they belonged to a union.

True it is, the findings of the Board are conclusive if supported by the evidence, 29 U.S.C.A. § 160, but it is a question of law as to whether there is sufficient evidence to support the Board's findings of fact. Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965; Consolidated Edison case, supra, and National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Consolidated Edi-

son case, supra, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury, Columbian case, supra, 306 U.S. 292-300, 59 S.Ct. 501, 505, 83 L.Ed. 660.

We must be mindful that the authority granted by the National Labor Relations Act to "effectuate the policies" is not unlimited. Orders without a basis in evidence, having no rational probative force, are not justified, National Labor Relations Board v. Falk Corp., 7 Cir., 102 F. 2d 383; the Act does not interfere with the normal right of the employer to select its employees or to discharge them, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46 and Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949, 957; and, in administering the Act, the Board must deal fairly with all parties, Consolidated Edison case, supra, 305 U.S. at page 235, 236, 59 S.Ct. 206, 83 L.Ed. 126.

Evidence that particular jobs had been discontinued and that no replacement employees have been hired tends to show that the discharges are not discriminatory and may constitute a defense. In re Acme Air Appliance Co., 10 N.L.R.B., No. 123; and In re Mt. Vernon Car Manufacturing Co., 11 N.L.R.B., No. 46.

It is the duty of the court to enforce the order as written, both in its prohibitory and in its mandatory phases, if in its opinion the order is supported by findings and is such an order as under the law should properly have been entered. It is its duty to decline to enforce it, if in the opinion of the court it is not so supported by the law and the facts. National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 91 F.2d 509, 514.

The jurisdiction to review the order of the Labor Relations Board is vested in a court with equity powers and, while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action. The purpose of the judicial review is consonant with that of the administrative proceeding itself,—to secure a just result with a minimum of technical requirements. Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221.

Applying the law to the foregoing facts and all just inferences that can be drawn therefrom most favorable to the findings of the Board, we are of the opinion that they do not establish a reasonable basis for the conclusion that these employees were discharged because they belonged to the Union.

The Board by its original order (4) (b) and (c) directed respondent offer full reinstatement to their former positions and make whole those employees who were on strike on August 8, 1935. Respondent objects to the enforcement of this order on the ground that the strikers have been offered reinstatement. We think the Board is entitled to an entry of a decree enforcing this order, even though the order has been obeyed. National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193, National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

(4) (g) ordered respondent to post a notice that it will cease and desist. It should be enforced. National Labor Relations Board v. Falk Corporation, 7 Cir., 102 F.2d 383.

We conclude that the motion of the Board to strike the additional testimony adduced be and the same is hereby denied, the order of the Board will be enforced except as to (4) (a) (d) and (e), and a decree will be entered in accordance with this opinion.