**NATIONAL LABOR RELATIONS BOARD v. MOORE–LOWRY FLOUR MILLS CO.**

**MOORE–LOWRY FLOUR MILLS CO. v. NATIONAL LABOR RELATIONS BOARD.**

Nos. 2226, 2234.

Circuit Court of Appeals, Tenth Circuit.

July 17, 1941.

Application to Modify Decree Denied Sept. 6, 1941.

420

PHILLIPS, Circuit Judge, dissenting.

———◇———

Joseph Hoskins and Leonard Appel, both of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Lewis M. Gill, and Jerome I.

Macht, all of Washington, D. C., on the brief), for National Labor Relations Board.

George Siefkin, of Wichita, Kan. (George B. Powers, of Wichita, Kan., on the brief), for Moore-Lowry Flour Mills Co.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Moore-Lowry Flour Mills Company, a corporation, hereinafter called the company, operates at Coffeyville, Kansas, a flour mill for the processing of grain into flour and other products, and it also operates ten grain elevators at various places in that state; Flour Mill and Cereal Workers Union No. 20601, affiliated with the American Federation of Labor, hereinafter called the union, is a labor organization admitting to membership employees of the company; and Moore-Lowry Flour Mills Employees Association, hereinafter called the association, is an unaffiliated labor organization admitting to membership employees of the company.

In a conventional proceeding, had under section 10 of the Act of July 5, 1935, 49 Stat. 449, 29 U.S.C.A. § 160, to which the association became a party by intervention, the National Labor Relations Board, hereinafter called the Board, ordered the company to cease and desist from in any manner dominating or interfering with the administration of the association, or with the formation or administration of any other labor organization of its employees, and from contributing support to the association or to any other labor organization of its employees; from recognizing the association as the representative of any of its employees for collective bargaining purposes; from giving effect to a contract entered into with the association, or to any extension, renewal, modification, or supplement thereof, or to any superseding contract which may be in force; from discouraging membership in the union or in any other labor organization of its employees by discriminating in regard to hire or tenure of employment or any term or condition of employment, of its employees; and from in any manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in section 7 of the act. 29 U.S.C.A. § 157. And the order required the company to withdraw all recognition from the association; to offer to Orville Lander immediate and full reinstatement of his former or a substantially equivalent position without prejudice to his seniority and other rights and privileges; to make Lander whole for any loss of pay he may have suffered by reason of the company's discrimination in regard to his hire and tenure of employment; upon application, to offer to Harlan Ray and Owen Kline immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights or privileges; to make Ray and Kline whole for any loss they may have suffered by reason of any refusal of their application for reinstatement, by payment to each of them of a sum of money equal to that which he normally would have earned during the period from a date five days after the date of the refusal to the date of reinstatement; and to post appropriate notices.

By separate petitions for review the Board seeks enforcement of the order and the company prays that it be set aside. Pursuant to a stipulation of the parties, the two causes were consolidated, submitted on a single record, and briefed and argued together.

The company employs in its mill at Coffeyville approximately thirty-eight workers and thirteen persons in clerical and supervisory capacities. During the fiscal year beginning June 1, 1937, it purchased about eight hundred carloads of grain, of which approximately one-fourth was purchased outside of Kansas. The mill produces about twenty to twenty-five thousand barrels of flour per month, more than one-half of which is sold and transported to points in other states. The nature and extent of the operations of the company bear such close and intimate relation to interstate commerce as to bring the company within the scope of the act and subject it to the jurisdiction of the Board. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Southern Colorado Power Co. v. National Labor Relations

Board, 10 Cir., 111 F.2d 539; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473; Cudahy Packing Co. v. National Labor Relations Board, 10 Cir., 118 F.2d 295.

 In addition to numerous subsidiary findings which need not be detailed, the Board found that by interfering with, restraining, and coercing its employees in the exercise of rights guaranteed in section 7 of the act, the company was engaged in unfair labor practices, within the meaning of section 8 (1), 29 U.S.C.A. § 158(1); and that by dominating and interfering with the formation and administration of the association and contributing to its support, the company was also engaged in unfair labor practices, within the scope of section 8 (2). These primary findings are challenged on the ground that they are not supported by substantial evidence and are in conflict with the evidence. The act commits to the Board the function of drawing inferences from established facts and circumstances of appraising conflicting evidence, of determining the credibility of witnesses and the weight to be given to their testimony, and of resolving issues of fact. And it is settled beyond room for argument that courts are not at liberty to overturn findings of the Board if they are supported by substantial evidence. National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368; Continental Oil Co. v. National Labor Relations Board, supra; Magnolia Petroleum Co. v. National Labor Relations Board, 10 Cir., 115 F.2d 1007; Cudahy Packing Co. v. National Labor Relations Board, supra. With this controlling rule in mind, we turn to the record.

Evidence was introduced which tended to establish these facts: In April, 1937, the union was organized by employees of the company as well as those of Nutrena Mills Company, located just across the street. Orville Lander and Harlan Ray were charter members of the union; Wilson Ray, son of Harlan Ray, became its president; and Lander became its secretary. Prior to that time, Ray and Lander had been on friendly terms with Lee Hood, superintendent of the mill, but thereafter Hood's attitude changed. He referred to them as "Reds," "Bolsheviks," and "troublemakers," and stated on one occasion that he intended to assign them to work together in order that they could not organize. He asked Ray if he was a member of the union and upon receiving an affirmative answer stated that a company union was best. Ray expressed the view that a company union would violate the act, and Hood thereupon belittled the act and stated that he was going to fire one man that day and one every thirty days until he got rid of all of them, and on another occasion he told Ray that he had been a good man for a long time but was just a troublemaker since he joined the union. Hood made slurring remarks about Lander, and told him on one occasion that he did not have any sense. On another occasion he pointed out Lander to Watson Ellis as a union man who held a job in the union. When Lander stated that he was secretary of the union, Hood inquired what he thought the union was going to do, and stated that he belonged to a union once and "got a good gypping"; Ellis said that he had a similar experience, that he once joined a union, that he had saved up some money, and that the union got all of it; and Hood and Ellis said that a company union was best, that they should have a company union so that no dues would have to be paid out. After some intervening discussion, Hood admonished Lander not to think that because he was a member of the union he could not be fired because Hood was going to fire union men when they thought that. Charlie Cox, warehouse foreman, announced to a number of employees that he did not mind seeing them all get together but that they did not want outside representatives there.

In June, the organization of an unaffiliated union was initiated. After two informal meetings had been held on the lawn—company property—in front of Hood's office, a notice signed by W. H. Hurt, an employee, was posted on the bulletin board of the company announcing that a meeting would be held on the lawn that evening. The meeting was opened with the statement that its purpose was to organize a little company union of the employees. Hurt, Reidy and Ellis were elected president, secretary and treasurer, respectively. Reidy and Ellis were second millers. The next day Hood demoted Lander from the position of oiler to that of sweeper at reduced wages. Maiden, an organizer for the American Federation of Labor, took up the matter with Hood. After some discussion, Hood agreed to reinstate Lander to his former position. But, despite the agreement,

on the following morning Lander was summoned to the office of Hood and found Hood, Cox, Hurt and Reidy there. Hood informed Lander that he had left to the committee the question whether he should be restored. Lander protested. One member of the committee told him that they were trying to organize a little company union in which all employees could work together and be satisfied, that they would put him back on the job and for him to go back and behave. Cox said that if Lander had been working for him he would have fired him two weeks previous. After some discussion, Lander resumed his former position. Another meeting of the company union was held on company property at which a proposed contract with the company was discussed but no formal organization was perfected. The union lodged charges with the Board in which it was charged that the company was engaging in unfair labor practices in connection with the formation and maintenance of the company union. A representative of the Board and representatives of the company conferred. After discussion, in which the propriety of certain employees being members of the organization was challenged, it was agreed that the company should refuse to recognize the organization. Another meeting was held the same day, with Maiden, Hurt, and perhaps one or two other members of the newly formed organization present, at which the persons last mentioned were advised that the organization did not comply with the terms of the act and therefore the company would not recognize it. Within a day or two thereafter, representatives of the company met with representatives of the Board in Kansas City, and a notice was prepared and signed by the company stating that it recognized the rights of the employees to self-organization and to bargain collectively through representatives of their own choosing; that under the act the company was prohibited from interfering with, restraining, or coercing employees in such rights, and from dominating or interfering with the formation or administration of any labor organization, or from contributing financial support to it; that the company intended to comply with the act; that charges had been filed against such organization and because of such charges it was deemed inadvisable for the company to recognize the organization as a bargaining agency; that a representative of the Board had given assurance that an appropriate election would be held for the purpose of the employees selecting an agency as their bargaining representative. The notice was seasonably posted on the bulletin board of the company. Almost immediately after Hurt and others were advised that the organization could not be recognized and before the posting of the written notice, Hurt, Reidy and Ellis obtained the services of an attorney in the formation of another organization. The attorney prepared bylaws of the association. Hurt signed and posted a notice on the bulletin board that a meeting would be held for the purpose of considering its organization. The meeting was held on July 13th in the garage of the company, either adjoining or immediately adjacent to the office of Hood. Hurt opened the meeting with the statement that the old organization had been knocked out, that it was necessary to elect new officers, and that bylaws for a new organization and a proposed contract with the company had been prepared. The bylaws were read and adopted. A notary was called from the office and the bylaws were acknowledged before him. Hurt was elected president, but Reidy and Ellis were replaced by others. However, they became members and signed the bylaws. The proposed contract was considered and it was decided to submit it to the company. The meeting was held during working hours and lasted for about two hours. Some if not all of the employees punched the clock, but the testimony is in conflict as to whether a deduction was made in wages for the time thus spent. Hood told Lander to attend the meeting. Lander stated that he would not be welcomed. Hood disagreed and told him to attend, and said that they would treat him right. He also directed a group of employees to go to the meeting and said that he could operate the mill by himself. Cox told an employee in his department that there would not be any work that morning until the meeting ended. About three days after the meeting, Hood referred to Lander and Ray as "Reds," asked them what they thought of their union organization then, and stated that they had better get out of it and get into the association. About ten days after the meeting, officials of the company and representatives of the association conferred one evening and agreed upon a proposed contract. The following morning, during working hours, the association held a second meeting in the garage and voted to accept the terms. The mill was shut down during the meeting. Hood told Ray that he

had better attend the meeting. Ray replied that it was for members of the association and that he was not a member. Hood then directed Ray to sit on the dock until the meeting ended. Hood also told Lander that he might as well sit on the dock with Ray until the boys got back. And the two sat there together until the meeting closed. After the association had been fully organized, Hood adopted the policy of submitting the names of applicants for employment to the committee of the association for its approval, although the contract failed to contain a provision requiring that he do so.

At the time of the posting of the notice that the company would not recognize the first organization, and at the time the association was in process of organization in the manner outlined, an article from the American Miller, a trade magazine, was posted on the bulletin board of the company. It was entitled "Don't be a Sucker." It said among other things:

"There's a big difference between gentlemanly organization and mad-dog terrorism. We have no room here to dissect the current reign of labor-agitation but room must be made for a word of warning to all employees to let the beast alone. Hands off! Poison! * * * Now here's the point: Don't be a dupe for any wily organizer. * * * Finally if you suffer from arrested mental development—if you believe the tripe which labor agitators stuff into simple ears—at least keep your mouth shut. Reckless gabbing will ruin your future. * * * Not long ago an employer quietly pointed to one of his workmen, 'We have been grooming that man for a superintendency,' he whispered. 'But, to our surprise, he's begun preaching unrest to our people. He's getting nowhere because our men are thoroughly contented. The poor fool will never know it, but he's missed the advancement and financial benefits we had planned for him—simply because he was putty in the hands of the labor wolves.' * * * This needs no amplification—don't be a goof!"

A clipping from another issue of the publication was also posted. It was entitled "The Code of the Trustworthy Mill Worker," and contained this language:

"If conditions do not suit you, talk it over with your superiors. But—be an American. Not a rat, operating in the shadows. Avoid company with rabble-rousers. Remember always that radical agitators are seeking to feather their nests—not yours. There's no future for you as a cog in mad-dog labor movements. Thinking millers agree with the Southerner who recently wrote: 'We're still backward enough down here to believe in property and civil rights. And no hunkies with dynamite can change our minds'."

Considered as a whole the evidence and the inferences fairly to be drawn from it warranted the Board in making the findings in question. In other words, it cannot be said that the findings are not supported by substantial evidence. True, there was countervailing evidence of substance but it merely presented issues of fact for the determination of the Board, not this court.

Reidy and Ellis, second millers of the company, were the secretary and treasurer, respectively, of the first organization. As second millers they were in charge of the mill at night during the absence of the superintendent, and gave orders to other employees. They were not foremen or supervisors to whom executive functions had been committed. They did not have the power to hire and fire. But they were "lead men" to whom a measure of authority over employees during the absence of the superintendent had been entrusted, and they occupied positions which could be utilized strategically in respect to translating to their subordinates the desires and policies of the company. Their membership and official positions in the earlier organization prejudiced the right of the employees to freedom of self-organization, within the scope of the act. National Labor Relations Board v. Continental Oil Company, 10 Cir., 121 F.2d 120.

Company sponsorship and influence of an earlier organization does not affect a later one provided there is a clear and complete cleavage between the two. But the slate must be wiped clean by the complete abandonment of the old and a bona fide, separate and distinct beginning of the new. Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87; Continental Oil Company v. National Labor Relations Board, supra; Magnolia Petroleum Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Continental Oil Company, supra. The Board found in this case that the sponsorship and influence of the company in the organization of the earlier organization was carried forward and continued to dominate the association. The evidence and the inferences

which the Board was warranted in drawing from it support the finding. It therefore must stand on review.

But let it be assumed for the moment that there was a clear and complete cleavage between the first organization and the association. Two meetings of the association were held on company property immediately adjacent to the office of the superintendent, one during working hours; the superintendent directed Lander to attend the first, and stated that he would be treated right; he also directed a group of employees to go to the meeting and stated that he could run the mill himself; Cox told an employee in his department that there would not be any work until the meeting ended; a notary was called from the office into the meeting to take acknowledgments to the bylaws; and about three days later Hood referred to Lander and Ray as "Reds," inquired what they thought of the union and stated that they had better get out of it and into the association. The mill was shut down during the second meeting; Hood told Ray that he had better attend the meeting; he then directed Ray and Lander to sit on the dock until the meeting ended; a contract with the association was speedily entered into; without any obligation to do so, Hood adopted the policy of submitting the names of applicants for employment to the committee of the association for approval or rejection; and he submitted to the committee the question whether Lander should be restored to the position of oiler from which he had been demoted. Such acts, conduct and statements, and others not necessary to detail, considered separate and apart from the evidence relating to the first organization, interfered with the right of the employees to self-organization, and support the finding that the company engaged in unfair labor practices.

█ The Board found that in August, 1937, the company discharged Lander and refused thereafter to reinstate him because of his membership in and activities on behalf of the union, and in that manner restrained and coerced its employees in the exercise of the rights guaranteed to them by section 7 of the act. Many subsidiary findings were made concerning the discharge and refusal to reinstate. The primary findings are challenged on the ground that they are without substantial evidence. Evidence was adduced which tended to prove these facts: Lander had worked for the company since 1934. He was first employed as a millwright helper but was later promoted to the job of oiler. He and Claude Cox, son of the warehouse foreman, had some heated words in the mill. Cox walked away but soon returned with a butcher knife in his hand. A fight ensued. Hood separated the combatants. He had not seen the beginning of the encounter and did not know how it originated. Still, without making any effort to ascertain who started it or who was at fault, he immediately stated to Lander that he and Ray had reached the point where they thought they were running the place. Hood reported the incident to Kliwer, a traveling superintendent who happened to be there that day, and Kliwer discharged both combatants. Almost immediately Cox was given a job in the mill of the company at Wichita; and soon thereafter, at the request of the association, he was reinstated to his former position at Coffeyville. Lander made efforts to be reinstated, and Maiden interceded for him. He declined to appear before the executive committee of the association for the purpose of a hearing on the matter of his reinstatement. Certain officers and the attorney for the company met with Lander and representatives of the union to consider the matter. Lander made a statement and requested that Cox be called but the officers conferred with him later in the absence of Lander and representatives of the union. At the suggestion of Maiden, Lander declined to answer certain questions which the attorney for the company propounded to him. The evidence is in conflict as to whether the questions related to the encounter or the union. The attorney advised Lander by letter that his request for reinstatement was refused. The latter stated that in addition to his version of the physical encounter which was the immediate cause of his discharge, "consideration was also given to other matters affecting your conduct as an employee and acts of insubordination occurring during the course of your employment, as well as facts concerning the character of your work which you have performed." The letter further stated that the conclusion was rested entirely upon the fitness of Lander as an employee, and that all facts concerning the controversy in respect to labor organizations had been excluded. About ten days after the discharge, and prior to the hearing and the writing of the letter by the attorney, Kliwer gave Lander a general letter of recommendation in which it was

stated that he had been "recently dismissed due to causes which in no way reflect as to his ability." And it recommended "him to anyone needing his services in the capacity of Oiler or Spouter." And, Kliwer told Lander that he would like to reinstate him but could not do so because the association committee would not allow it. The finding that the original discharge was occasioned by Lander's labor affiliation and activities may be open to question. But the finding that the refusal to reinstate Lander was motivated by his membership in the union and his activities in its behalf is supported by substantial evidence.

■ Discrimination in the employment or reinstatement of a former employee, due to his affiliation with a labor organization or activities in its behalf within permissive bounds, constitutes an unfair labor practice. Cf. Phelps Dodge Corporation v. National Labor Relations Board, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217, decided April 28, last.

■ The provision in the order of the Board directing the company, upon application, to offer employment with back pay to Harlan Ray and Owen Kline and to make them whole, rests upon findings that the union called a strike at the mill because of the discharge of Lander and the refusal to reinstate him, that Ray and Kline, the only employees besides Lander who were members of the union, went on strike, and that the strike was still in effect at the time of the hearing. Section 10(c) of the act expressly empowers the Board to require an offending employer to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of the act. And the action of the Board in ordering an employer to offer employment with back pay to its employees on strike has been sustained. Jeffrey-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948, certiorari denied, 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; National Labor Relations Board v. Boss Manufacturing Co., 7 Cir., 107 F.2d 574, National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, certiorari denied, 61 S.Ct. 447, 85 L.Ed. ——.

■ But the company contends that these two striking employees are not entitled to reinstatement with back pay because of certain acts of trespass at the mill. Striking employees who commit unwarranted acts of trespass or violence against the property of the employer are not entitled to reinstatement, with or without back pay. National Labor Relations Board v. Fansteel Corporation, 306 U.S. 240, 59 S. Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 107 F.2d 472, modified on another point, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6. Here, the mill was shut down for approximately thirty minutes beginning at about the time the strike was called, and the record indicates that it was due to an interruption of power. However, each of the two employees unqualifiedly denied that he had anything to do with it or knew the cause, and no other evidence was introduced relating to the matter. In short, the contention of the company is met with an absence of proof to sustain it.

■ The order provides in paragraphs 2(c) and (e) that in making Lander, Ray and Kline whole, the company shall deduct from the respective amounts due them the sums received during the period in question for work performed upon Federal, State, county, municipal, or other work-relief projects. Those provisions are beyond the authority of the Board. Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6.

The order of the Board will be modified by eliminating the provisions contained in paragraphs 2(c) and (e) respecting the deduction of the amounts received from governmental agencies; and, as modified, it will be enforced.

PHILLIPS, Circuit Judge (dissenting).

On June 11, 1937, the Flour Mill and Cereal Workers Union No. 20601 [1] filed charges with the National Labor Relations Board's Regional Office at Kansas City, Missouri, alleging that the Moore-Lowry Flour Mills Company [2] was engaging in unfair labor practices within the meaning of § 8 (2) of the Act. E. F. Merrill, general manager of the Flour Company, was requested to come to the office of George O. Pratt, Director of the Seventeenth Region, National Labor Relations Board, and dis-

---

[1] Hereinafter called the Union.

[2] Hereinafter called the Flour Company.

cuss the labor situation at Coffeyville. At a conference with Pratt it was agreed that Foster, a representative of the Board, Merrill, and Foulston, attorney for the Flour Company, would meet at Coffeyville. Two conferences were held at Coffeyville on June 15 and 16, 1937. At the first conference, Foster represented the Board, Foulston the Flour Company, and Maiden[3] and Beam the Union. Foster stated the local organization was improper because two supervisory employees were acting as officers and because of the activity of Hood, the Flour Company's mill superintendent. It was agreed that the Flour Company would not recognize the local organization, that it would be disbanded, and that notice to that effect would be given by the Flour Company. At the second conference, Foster represented the Board, Merrill and Foulston the Flour Company, and Hurt, Ellis, and Reidy, employees of the Flour Company, represented the employees. Foulston and Foster told the employees'

representatives that their association was not properly organized and would not be recognized. Foster told them their organization should have by-laws and provide for dues; advised them they had a right to organize if it was properly done; stated he thought it best for them to disband and try again; that they could confer with the Regional Office at Kansas City, if they wished, as to how to properly perfect their organization; that he could see no objection to their holding meetings on the Flour Company's property if the Flour Company did not object; and suggested they employ an attorney to help them. Shortly thereafter, a meeting was held at the Regional Office of the Board at Kansas City at which Pratt, Regional Director, Maiden, representing the Union, and Foulston, representing the Flour Company, were present. A notice was formulated and agreed to. It is set out in the margin.[4] It was posted on the Flour Company's bulletin board on June 21, 1937, and thereupon the charges

---

[3] Maiden was an organizer for the American Federation of Labor and secretary of the Kansas State Federation of Labor.

[4] To all Employees:

This notice is posted in order that the employees of the company may be familiarized with the attitude of the company respecting the matters herein stated.

1—The Company recognizes the right of its employees to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

2—Under the Wagner Labor Act the Company is prohibited from interfering with, restraining, or coercing employees in the rights above recited. The Company is prohibited from dominating or interfering with the formation or administration of any labor organization, from contributing financial or other support to it.

3—The Company intends to comply with both the letter and the spirit of the law.

4—The Company has been advised that an employees' association has been formed and has requested that the Company treat with it. Subsequent to this request charges were filed claiming that 'this organization does not meet the requirements of the Wagner Labor Act and a conference has been had with the representatives of the Director of the National Labor Relations Board.

5—Because of this charge it is deemed inadvisable for the Company to acknowl-

edge the present organization of its employees as a proper bargaining agency.

6—The Company has been assured by the representative of the Director of National Labor Relations Board that if properly requested by the employees, an impartial election will be had under the supervision of a representative of that Board and the employees of this company by means of a secret ballot will be permitted to determine what agency, if any, shall be entitled to act as the bargaining representative of the employees.

7—If such election is requested any organization of employees properly formed as the requirements of the Wagner Labor Act, will have the right to be represented on the ballot for the purpose of determining the sole bargaining agency for the employees.

8—It is improper for the company to do anything which will interfere with the freedom of choice by the employees. Superintendents and other representatives of the Company not entitled to membership in the bargaining agency are prohibited from doing anything to affect or influence the action of the employees.

9—Employees are requested to refrain during working hours from discussion of these matters.

10—The Company has been assured by the Director of the National Labor Relations Board that any employee or group of employees may avail themselves of the advice of said department concerning any questions which may arise in connection with the matters herein referred to.

were withdrawn. At the conference, Pratt stated he saw no objection to letting groups meet peaceably on the Flour Company's property.

The executive committee of the original organization, Hurt, Ellis, and Reidy, consulted Welch, an attorney at Coffeyville, with a view to setting up a properly formed local organization. Hurt, a former school teacher, employed by the Flour Company as a laborer in the sack room and as a night watchman on Sundays and holidays and occasionally on nights when the regular watchmen were off, was the leader in the formation of both local organizations. Before consulting Welch, Hurt made inquiry of the employees as to whether they should make a second effort to effect a local organization and having received affirmative answers, posted a notice for a meeting to be held on July 13. The meeting was held in the Flour Company's garage on company property. About 35 of the 40 employees attended. Hurt opened the meeting by announcing that it was necessary to disband the old organization because of the fact the supervisory employees had been elected as officers. The by-laws which had been prepared by Welch were read. Lander, secretary of the Union, also read a portion of the National Labor Relations Act to the employees. Thirty-one employees signed the by-laws at the meeting and four signed them later. The name adopted by the new organization was Moore-Lowry Flour Mills Employees Association.[5] Hurt was elected president, Chester Doss, secretary, and Will Akers, treasurer. Two candidates were nominated for secretary and treasurer, and the successful candidates were elected by secret ballot. Welch notified Merrill and Foulston that the Association had been organized and requested a conference for the purpose of negotiating a working agreement. Thereupon, Foulston wrote Pratt that the new organization had requested a contract covering wages and hours of employment for the ensuing year, enclosed a copy of the by-laws of the new organization, and inquired whether the Board desired to hold a secret election. Pratt did not reply to the letter. Ten days later, representatives of the Association and the Flour Company met and discussed the contract. There were some points of difference, including the amount of increase in wages. An agreement was reached subject to approval by the members of the Association. It was submitted to the membership of the Association at a meeting held in the company garage on July 24. It was approved by the Association and was thereupon executed.

The meetings of July 13 and July 24 were held during working hours on company property.

When Lander reported for work on the morning of July 13, Hood stated to him, "You had better get yourself over to that meeting." Lander replied that he might get "bawled out" if he took the time out. Hood replied, "No, you won't get bawled out; you attend the meeting and they will treat you right." As the employees were proceeding to the meeting place, Hood said, "All you guys get over to that meeting; I can run this mill by myself." Cox, a foreman, told other employees when they reported for work that there would not be any work until after the meeting was completed. Hood told Ray, an employee who was active in the Union and the father of its president, that he "had better go on over to that meeting." When Ray demurred on the ground he was not a member of the Association, Hood told him to "sit here on the dock until the meeting is over with." At the same time Hood told Lander that he "might just as well go out there and sit down with Nick [Ray] until the boys get back." The employees were docked for the time spent at the Association meetings held during working hours.

While the meetings were held on company property, that action was sanctioned by Foster, representative of the Board. This constituted at most a trivial contribution by the Flour Company.

The employees were free to adopt any form of organization and representation, whether purely local or connected with a national body. A local labor organization may be the product of the right of the employees to self-organization and to collective bargaining "through representatives of their own choosing" guaranteed by § 7 of the Act.[6] They had the right to form such local organization immediately after the disestablishment of the original local organization.[7] When the first organization

[5] Hereinafter called the Association.

[6] National Labor Board v. Newport News Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Board v. Link-Belt Company, 311 U.S. 584, 587, 61 S.Ct. 358, 85 L.Ed. 368.

[7] Humble Oil & Refg. Co. v. Labor Board, 5 Cir., 113 F.2d 85, 88; National

was disbanded and the notice posted, the slate was wiped clean. See National Labor Board v. Newport News Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219.

Thirty-eight of the employees testified that they voluntarily organized the Association and that they were not influenced in joining it by any action of the Flour Company. There was no evidence that Hurt, who was the moving spirit in the organization of the Association, was in anywise influenced by the Flour Company, and he testified he acted voluntarily and without suggestion from the management of the Flour Company. I think there was no substantial evidence that the Flour Company interfered with the organization of the Association.[8] The only thing of moment that occurred was the statement by Hood when the men were proceeding to the meeting of July 13, "All you guys get over to that meeting." It is obvious that the statements of Hood to Lander and Ray, who were members of the Union and who never joined the Association, were innocuous and of no effect.

What was said by the court in Humble Oil & Refg. Co. v. Labor Board, 5 Cir., 113 F.2d 85, 92, is apposite:

"It would be strange indeed if a labor organization, freely organized by a large majority of the employees, is to be destroyed whenever some well-wishing supervisor, contrary to his own duty and orders, says something in its favor. As we see it, the employees who freely formed these organizations have the right under the law to have them function. If the employer trespasses through his representatives, he and they ought to be stopped, but a more serious and demoralizing trespass than here appears is necessary to show such domination or interference or support as will justify annihilation of such organizations."

Neither do I think the fact that Reidy and Ellis, second millers, accompanied Hurt when he consulted Welch respecting the formation of the Association and employment of him to draft the by-laws is of material importance. Neither had authority to hire or discharge. While they were in physical charge of the mill at times, adjusted machinery and made repairs, they were at all times under the general direction and supervision of the superintendent and foremen and carried out only routine work. Such being their status, they were eligible to membership in the local organization.[9]

I think the evidence clearly established that the employees wanted their own local organization and that when they found the first organization was defective, acting under the advice of Foster, representative of the Board, they undertook to form a local organization which would comply with the requirements of the Act.

The Board severely condemned a provision of the contract limiting the Association's bargaining committee to employees of the Flour Company. It was in the draft of the contract prepared by Welch. The employees had the right to select any bargaining agent they chose. That is one of the rights guaranteed under the Act. They had the right to eliminate from the bargaining committee any person who was not a fellow employee. I see no basis for the condemnation.

It is my conclusion that those parts of the order directing the disestablishment of the Association and the withdrawal of recognition of the Association as the bargaining agent of the employees and directing the Flour Company not to give effect to the contract should not be enforced.

PER CURIAM.

A majority of the court is of the opinion that neither the order of the National Labor Relations Board nor the decree should be modified.

PHILLIPS, Circuit Judge, is of the opinion that subdivision 2(f) of the decree should be modified by inserting after the words "American Federation of Labor," the following "or any other proper labor organization."

The application is denied.

---

Labor Board v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, 871; Magnolia Petroleum Co. v. Labor Board, 5 Cir., 112 F.2d 545, 552.

[8] See Cupples Co. Manufacturers v. Labor Board, 8 Cir., 106 F.2d 100, 114; Ballston-Stillwater Knitting Co. v. Labor Board, 2 Cir., 98 F.2d 758, 760, 761;

L. Greif & Bro. v. Labor Board, 4 Cir., 108 F.2d 551, 557, 558.

[9] See In the Matter of Kansas Milling Company and Flour, Feed, Seed, Cereal & Elevator Workers Union, No. 20991, A. F. of L., No. R 1439, Labor Board Dec., decided September 2, 1939; Magnolia Petroleum Co. v. Labor Board, 5 Cir., 112 F.2d 545, 552.